Docket No. 83670–Agenda 3–September 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HECTOR NIEVES, Appellant.

Opinion filed November 16, 2000.

JUSTICE RATHJE delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Hector Nieves, was convicted of first degree murder. The same jury found defendant eligible for the death penalty based upon convictions for two or more murders. After the jury found that no mitigating circumstances existed sufficient to preclude the imposition of the death penalty, the court entered judgment on the jury’s finding and sentenced defendant to death. Defendant’s sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 609(a). In this appeal, defendant raises 12 issues challenging his conviction and death sentence. We affirm defendant’s conviction, reverse defendant’s sentence of death, and remand the cause for the imposition of a sentence other than death.

BACKGROUND

Late in the evening of September 13, 1992, police found the body of the victim, Louis Vargas, behind a building at 2808 West North Avenue in Chicago. Vargas’ face and head had been badly beaten with what police believed to be a blunt object. His body was found between the rear wall of the building and a large truck, lying face down in a pool of blood on top of several cardboard boxes. Police determined that Vargas had died fairly recently, as his head was still bleeding when they arrived on the scene. Vargas’ shoes were missing, and one of his pants’ pockets was bloody and turned inside out. No identifiable fingerprints or other physical evidence was found at the murder scene. Police searched the vicinity of the crime scene, including nearby Dumpsters and garbage cans, but did not find a murder weapon.

The day after Vargas’ body was found, the police interviewed several people in the area. Although no witnesses to Vargas’ beating were located, Anthony Laboy told police that he had seen Vargas in Humboldt Park the previous day. Laboy was sitting on a bench drinking a beer around 6:30 p.m. when he saw Vargas and another man, known only to Laboy as “Papo,” about 25 feet away. According to Laboy, the two were arguing over money to buy liquor.

Laboy further told police that, in the course of the argument, Papo took out a long cylindrical object that looked liked a screwdriver or an ice pick. Papo turned toward Vargas, who grabbed the object and threw it to the ground. Vargas then grabbed Papo’s walking cane and threw it to the ground. Next, Vargas “slammed” Papo to the ground. After this incident, Vargas and Papo walked away with several other men. According to Laboy, the argument had ended, and everything looked to be “straightened out.” Laboy did not see Vargas or Papo the rest of the night.

Based on Laboy’s information, police searched Humboldt park for Papo, later identified as defendant, Hector Nieves, to question him in connection with Vargas’ murder. Police were unable to locate defendant, however, and the murder went unsolved for more than a year and a half.

On May 20, 1994, New York City officials contacted the Chicago State’s Attorney’s office regarding a man who surrendered to New York police in connection with a murder in Central Park and who also wished to make a statement regarding a murder in Chicago. Cook County Assistant State’s Attorney John Muldoon, Chicago police detective Louis Rabbit, and a court stenographer traveled that same day to New York City to meet with the man, who identified himself as Hector Nieves. After Muldoon and Rabbit advised defendant of his rights, defendant spoke privately with them for about 20 minutes. At the conclusion of this conversation, defendant agreed to give a court-reported statement.

After again being advised of his rights, including the right to remain silent and the right to counsel, defendant stated that he was with Vargas in Humboldt Park during the afternoon of September 13, 1992. The two began arguing when defendant refused to give Vargas a dollar to buy wine. Vargas became very upset and threw defendant’s walking cane, which defendant needed due to a recent leg surgery. Defendant stated that he got angry at Vargas for taking his cane and decided to retaliate. He formed a plan to wait for Vargas to go to sleep and then kill him.

Defendant further stated that, later that night, he went to Vargas’ usual sleeping place behind a restaurant at the intersection of North Avenue and California Street. Defendant knew that there was always a truck parked in the rear alley and that Vargas always slept underneath this truck. After finding a pipe in the alley, defendant climbed into the back of the truck and waited for Vargas. Vargas arrived around 9:30 or 10 p.m. Defendant waited approximately 15 minutes to be sure that Vargas was sound asleep, and then climbed out of the truck. He struck Vargas on the head with the pipe between 10 and 15 times, killing him. Defendant stated that he then left the scene, throwing the pipe into a back yard about three houses away.

The case proceeded to trial in June 1997. In addition to Alexander Laboy and John Muldoon, several Chicago police personnel who worked on the case testified for the prosecution. Dr. Edmond Donoghue, chief medical examiner for Cook County, testified as to the cause of Vargas’ death. Dr. Robert Kirschner, who had performed the autopsy on Vargas’ body, had since retired and was out of the country. Dr. Donoghue reviewed Dr. Kirschner’s file and testified as an expert in forensic pathology. Dr. Donoghue concluded that Vargas died from severe injuries to the skull and brain consistent with being beaten about the head with a pipe. According to Dr. Donoghue, Vargas had been struck at least eight times in a beating that “would have killed anyone.”

No witnesses testified on behalf of the defense, which rested at the close of the prosecution’s case in chief. The jury then found defendant guilty of first degree murder.

At the death penalty eligibility hearing, New York City police detective Eugene Heghmann and New York Assistant District Attorney Cynthia Sippnick both testified regarding defendant’s involvement in the June 1993 death of Santos Bermudez. Sippnick further testified that defendant subsequently pleaded guilty in New York to first degree manslaughter in connection with Bermudez’s killing, and a certified copy of that conviction was entered into evidence.

At the close of Sippnick’s testimony, the trial court ruled, outside the presence of the jury, that the New York first degree manslaughter statute was substantially similar to the Illinois first degree murder statute. The jury then returned a verdict unanimously finding defendant eligible for the death penalty for having been convicted of murdering two or more individuals. See 720 ILCS 5/9–1(b)(3) (West 1996).

At the aggravation-mitigation phase of the death penalty hearing, the prosecution introduced evidence of defendant’s lengthy criminal history and numerous prison disciplinary infractions. The jury also heard evidence linking defendant to two additional murders, that of Lonnie Jackson in 1991 and of Rafeal Cuevas in 1992, to which defendant had confessed in separate court-reported statements made at the same time as his statement regarding the Vargas murder.

In mitigation, defendant presented testimonial evidence of his good behavior while held at the Cook County jail. Defendant’s brother also offered testimony of defendant’s abusive childhood. In addition, two licensed clinical psychologists testified as to defendant’s low intelligence and severe personality disturbance.

After hearing all the factors in aggravation and mitigation, the jury unanimously found that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty. The trial court then sentenced defendant to death.

ANALYSIS

Trial Errors

Voir Dire

Defendant first contends that his right to due process and a fair trial was abridged when he was not afforded the opportunity to question potential jurors after their responses to the trial court’s 
voir dire
 questions resulted in their excusal for cause. During 
voir dire
, the trial court first individually questioned each potential juror, without input from the State’s Attorneys or defense counsel. On the basis of their responses, the trial court either excused the potential jurors for cause or passed them along for further questioning by both parties.

After the first stage of this process, three potential jurors, George Mikicich, Eleanor Taylor and Jewel Heingeininger, were excused for cause after their responses to the court’s questions revealed that their beliefs would prevent them from imposing the death penalty. Two other potential jurors, Cecilia Isom and George Lyons, passed the first stage of questioning by the trial court, although they expressed concerns about the death penalty but stated that they would consider it. Upon further questioning by the prosecution, however, both Isom and Lyons were excused for cause after both stated that they would not be able to impose the death penalty.

Initially, we note that defendant objected only to the excusal of Mikicich, Isom and Lyons. Defendant did not object to the excusal of Taylor or Heingeininger, nor did he seek to question those potential jurors who were excused for cause after the court had concluded its examination of them. In this appeal, however, defendant does not argue that these potential jurors were improperly excused. Rather, he argues for the first time that the 
voir dire
 was unfair and prejudicial because the trial court allowed the prosecution to examine potential jurors who expressed scruples against the death penalty after their initial examination, but summarily excused for cause without further questioning by defense counsel those potential jurors who stated that they could not impose the death penalty. According to defendant, the prosecution was given greater latitude to question potential venire members and received a benefit when Isom and Lyons were excused without the prosecution having to use any of its peremptory challenges. Thus, the number of venire members that the prosecution was able to excuse was increased, some of whom may have been sympathetic to defendant. Defendant claims that he should have been given the same opportunity to question venire members Mikicich, Taylor and Heingeininger to clarify their stance regarding the death penalty.

The State asserts that defendant has waived review of this issue because defense counsel failed to object on this particular ground before the trial court and failed to raise this issue in his post-trial motion. We agree. To preserve an issue for review, a defendant must both object at trial and specifically include the objection in a post-trial motion. 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Here, defendant has never before raised the issue of being denied an opportunity to conduct additional 
voir dire
 of potential jurors Mikicich, Taylor and Heingeininger. Thus, this issue is waived.

Defendant next claims that the trial court abused its discretion when it refused to grant his motion for a mistrial after the prosecution asked a potential juror who worked at the Cook County jail whether he had worked with defendant. During 
voir dire
, potential jurors were called to the jury box in groups of 12 to be questioned. One such potential juror, James Graham, stated that he was a minister and had worked for 35 years as a volunteer at the Cook County jail. After the trial court’s initial 
voir dire
, the prosecution continued to question Graham about his work at the jail, during which the following exchange took place:

“Prosecution: In the course of your work with inmates at Cook County Jail, have you ever had occasion to work with any of the individuals on death row?

Graham: Yes, I have.

***

Prosecution: Have you ever had occasion to work with Mr. Nieves who is before your Honor, before the court today?

Defense: Objection.

Graham: No.”

At this point, a conference was held outside the presence of the jury where defense counsel moved for a mistrial on the basis that the prosecutor’s question implied that defendant was or had been incarcerated at the Cook County jail. Defendant’s motion was denied.

Defendant contends that the potential jurors who were present during the prosecutor’s questioning of Graham were left with the clear implication that he was involved in other criminal conduct or may already be on death row. Despite Graham’s negative response, defendant claims that the prosecutor’s question was deliberately posed to link defendant with the Cook County jail, thus prejudicing him to such a degree that a new trial is warranted. Defendant points out that the trial court had already asked all potential jurors whether they knew defendant, to which Graham responded in the negative. Thus, according to defendant, there was no reason to further ask Graham if he had worked with defendant.

The State responds that its questioning of Graham was proper in its entirety and was intended only to uncover whether Graham knew defendant. At worst, the State argues, the question may have alerted other potential jurors to the fact that defendant was in custody, but defendant’s conclusion that the question would lead other potential jurors to believe defendant had committed other crimes is unsupported. Further, the State points out, defendant has failed to establish how the jury that eventually heard this case was influenced or prejudiced by the prosecution’s questioning of Graham during 
voir dire
.

The decision whether to grant a mistrial is left to the discretion of the trial court. 
People v. Hall
, 114 Ill. 2d 376 (1986). There is no evidence to suggest that the prosecution’s questioning was designed to do anything more than determine whether Graham was acquainted with defendant. Given that defendant was awaiting trial for murder, it was not unreasonable for the prosecutor to ask Graham if he had encountered defendant through his work with inmates at the Cook County jail. This question does not necessarily imply that defendant had committed other crimes or was already on death row. It is more likely that potential jurors hearing the prosecutor’s question would make the quite logical inference that the prosecutor was referring to defendant’s time in custody pending trial for the murder of Louis Vargas. The jury pool was not so tainted as to warrant a mistrial based upon this question. Thus, the trial court did not abuse its discretion when it denied defendant’s motion for mistrial.

Furthermore, even assuming an error in the selection of jurors, reversal is not required unless the defendant has in some way been prejudiced. See 
People v. Lewis
, 165 Ill. 2d 305, 344 (1995). In 
Lewis
, this court held that the trial court’s statement to potential jurors that witnesses from Folsom Prison and the Alameda and Oakland police departments would be testifying did not so prejudice the defendant as to require reversal. 
Lewis
, 165 Ill. 2d at 347. In so holding, we rejected the defendant’s claim that the entire venire would have wondered, if not assumed, that the defendant was a convicted felon, stating that compelling eyewitness evidence against the defendant made it unlikely that his conviction was the result of the jury having heard the limited witness information. 
Lewis
, 165 Ill. 2d at 345.

We believe that the questioning of James Graham was proper. Moreover, we do not believe that defendant suffered any prejudice as a result.

Inadmissible Expert Testimony

Next, defendant argues that the testimony presented by Dr. Edmond Donoghue, chief medical examiner for Cook County, was not competent to establish Louis Vargas’ cause of death because it was based upon an autopsy performed by Dr. Robert Kirschner, who had retired and was out of the country at the time of trial. Defendant claims that, because Dr. Donoghue was not present during the autopsy and relied solely upon the medical examiner’s report in forming his opinion as to the cause of Vargas’ death, his testimony consists of inadmissible hearsay.

The State argues that defendant failed to preserve this issue for review because he did not object to the admission of Dr. Donoghue’s testimony at trial. We agree. Defendant did not object at trial and did not include this issue in his post-trial motion. To the contrary, after Dr. Donoghue testified as to his background and qualifications, defense counsel readily agreed that Dr. Donoghue was qualified to render an opinion, stating, “No questions, Judge, he’s an expert.” Defendant has therefore waived this issue.

Defendant also argues, however, that defense counsel’s failure to object to Dr. Donoghue’s testimony constituted ineffective assistance of counsel. According to defendant, there was no tactical reason for defense counsel’s failure to object and, had defense counsel done so, defendant would not have been convicted because all evidence concerning the cause of Vargas’ death would have been excluded.

To demonstrate ineffective assistance of counsel, a defendant must show (1) that his attorney’s performance fell below an objective standard of reasonableness and (2) that the attorney’s deficient performance resulted in prejudice to the defendant. 
People v. Williams
, 181 Ill. 2d 297, 320 (1998), citing 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). We decline to find ineffective assistance of counsel here, as any objection to the prosecutor’s remarks would rightfully have been overruled. The testimonial evidence offered by Dr. Donoghue was admissible pursuant to this court’s decision in 
Wilson v. Clark
, 84 Ill. 2d 186 (1981). In 
Wilson
, we held that an expert may give his opinion based upon facts that are not in evidence if those facts are of a type reasonably relied upon by experts in the particular field. 
Wilson
, 84 Ill. 2d at 193 (adopting Federal Rule of Evidence 703). In the instant case, Dr. Donoghue reviewed and formed his opinion based upon the contents of Dr. Kirschner’s medical file on Louis Vargas, which included autopsy photographs, a postmortem examination report, a toxicologic analysis report, an evidence receipt, diagrams made by Dr. Kirschner while he conducted the autopsy, an investigator’s report, and other administrative documents. We believe the reports found in Dr. Kirschner’s file, which Dr. Donoghue used in forming his opinion, are the type of evidence reasonably relied upon by experts in the field of forensic pathology to form their opinions as to the cause and manner of death.

This court also has held that experts not only may consider such information in forming their opinions, but may also testify as to nontestifying experts’ findings and conclusions. 
People v. Pasch
, 152 Ill. 2d 133, 176 (1992). While the contents of reports relied upon by experts would be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion. 
Pasch
, 152 Ill. 2d at 176. Here, Dr. Donoghue used Dr. Kirschner’s reports and records as the basis for forming his opinion as to the cause of Louis Vargas’ death. Such testimony was admissible. Thus, defense counsel’s failure to object did not fall below an objective standard of reasonableness.

Other-Crimes Evidence

Defendant next argues that the trial court abused its discretion by improperly allowing evidence of other crimes he allegedly had committed. First, defendant claims that such evidence was improperly introduced when Assistant State’s Attorney John Muldoon read the following portion of defendant’s court-reported statement:

“Muldoon: Now again Hector you turned yourself into the New York Police Department today, is that correct?

Defendant: Yes.

Muldoon: And you told them about this incident and some other incidents, is that correct?

Defendant: Yes.

Muldoon: Both in Chicago and in New York and–”

Defense counsel then objected. A sidebar was held in which defense counsel asked that the reference to “other incidents” be redacted from the copy of the statement that went back do the jury during deliberations. The trial court granted the request.

In general, evidence of other crimes is not admissible if it is relevant merely to establish defendant’s propensity to commit crimes. 
People v. Kliner
, 185 Ill. 2d 81, 146 (1998). Evidence that suggests or implies that the defendant has engaged in prior criminal activity should not be admitted unless relevant. 
People v. Lewis
, 165 Ill. 2d 305, 346 (1995). Defendant argues that the reference to “other incidents” in his statement constituted evidence of other crimes that had no probative value and was introduced only to show defendant’s propensity to commit crimes.

The State responds that the minor reference to other incidents was not introduced to show defendant’s propensity to commit crimes, but rather was relevant to explain the manner in which defendant came to be in the custody of the Chicago police. Furthermore, the State argues, even if the reference to “other incidents” should have been redacted from defendant’s statement before being read to the jury, in light of the overwhelming evidence of defendant’s guilt, the reference was not so prejudicial that it influenced the jury or denied him a fair trial.

Contrary to the State’s assertion, we do not believe that the reference to defendant’s “other incidents” in New York could have been properly introduced to show how the investigation of Vargas’ murder unfolded. When other-crimes evidence is presented as part of the steps in the investigation of a crime and the events leading up to it, the evidence must also be relevant to specifically connect defendant with the crimes for which he is being tried. 
Lewis
, 165 Ill. 2d at 346. We fail to see how any evidence of defendant’s criminal activity in New York is relevant to prove he committed the murder of Louis Vargas in Illinois. See 
People v. Richardson
, 123 Ill. 2d 322, 342 (1988) (other-crimes evidence not admissible in a criminal case unless it is relevant to prove that the defendant committed the crime at issue). While defendant’s presence in New York is relevant to explain the delay between the time of Vargas’ murder and defendant’s arrest, any evidence of other crimes committed by defendant while in New York is irrelevant to defendant’s guilt in the present case.

That said, this court repeatedly has held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. See 
Kliner
, 185 Ill. 2d at 147;
 People v. Cortes
, 181 Ill. 2d 249, 285 (1998);
 Lewis
, 165 Ill. 2d at 347; 
People v. Hayes
, 139 Ill. 2d 89, 145-46 (1990). Here, no other references were made to defendant’s New York criminal activity during the guilt phase of defendant’s trial, and the reference to “other incidents” was redacted from defendant’s statement before it was given to the jury. Thus, we agree with the State that any prejudicial effect that may have been produced by this one isolated and cryptic reference to defendant’s criminal activity in New York was overshadowed by the substantial evidence of defendant’s guilt–most notably, his own uncontested statement. While we believe the reference to “other incidents” was improper, we conclude that this error was harmless beyond a reasonable doubt. Thus, defendant was not denied a fair trial, and the trial court did not abuse its discretion.

Defendant next challenges the admission of Chicago police officer Frank DeMarco’s testimony that one of Vargas’ pants’ pockets was turned inside out when his body was found. Defendant claims that the trial court again abused its discretion by allowing improper and highly prejudicial testimony of other crimes because DeMarco’s statement implied that defendant robbed Vargas, a crime for which he was not charged.

The State asserts that the testimonial evidence regarding Vargas’ inside-out pants’ pocket was relevant to reveal the nature of the crime, citing 
People v. King
, 29 Ill. 2d 150, 153-54 (1963). We agree. In 
King
, the defendant was convicted of murder. On appeal, he argued that the trial court erred by admitting into evidence testimony concerning three knife wounds on the neck of the victim, claiming that the evidence raised an inference that the wounds were caused by the defendant, who had been charged only with her shooting. This court held that no error was committed by the trial court in admitting the testimony, stating:

“All evidence concerning ‘the physical facts and circumstances showing a killing are admissible in evidence as tending to throw light on the transaction and to reveal the nature’ of the crime. [Citation.] Also all facts of the crime which show the aggravated nature of the offense are relevant to the punishment to be set by the jury.” 
King
, 29 Ill. 2d at 154.

The testimony surrounding the condition of Vargas’ clothes when his body was found is clearly evidence of the physical facts and circumstances surrounding his murder. Defendant’s characterization of the testimony regarding Vargas’ inside-out pants’ pocket as improper other-crimes evidence is inaccurate; it is not evidence of another crime, but part of the very same crime at issue before the court. The fact that defendant was not charged with robbery is irrelevant, just as it was irrelevant that the defendant in 
King
 was not charged with stabbing the victim. In both cases, the evidence was properly admitted to shed light on the crimes committed. Therefore, we conclude that the trial court did not abuse its discretion by overruling defendant’s objection to this evidence.

Improper Closing Argument

Next, defendant claims that the following remarks made by the prosecution during its rebuttal closing argument denied him a fair trial:

“Prosecutor: Ladies and gentlemen, there is no stranger, there is no robber there that no one knows about, there was only one person in the entire universe who had a motive based on the evidence to kill [Louis Vargas].

Defense counsel: Objection, that is not a reasonable inference.

Trial Court: Proceed. The jury has heard the evidence.”

Defendant argues that the prosecution did not present any evidence from which it could be inferred that Vargas’ character was such that he had no enemies and that no one else in the entire world would have wanted to kill him. According to defendant, the prosecution’s remarks were based upon the unreasonable inference that, merely because the State only presented evidence concerning defendant’s motive, there could be no one else who had a motive to kill Vargas.

The State responds that its remarks constituted a reasonable characterization of the evidence and logical inferences drawn therefrom. Moreover, the State contends, its rebuttal argument was in direct response to and invited by defendant’s closing argument. Finally, the State asserts that, even if its rebuttal argument was improper, it did not result in any prejudice to defendant in light of the overwhelming evidence of his guilt.

In presenting a closing argument, the prosecutor is allowed a great deal of latitude and is entitled to argue all reasonable inferences from the evidence. 
People v. Johnson
, 146 Ill. 2d 109, 143 (1991). The standard of review applied to arguments by counsel is similar to the standard used in deciding whether a plain error was made: comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from those comments. 
People v. Henderson
, 142 Ill. 2d 258, 323 (1990). Here, the jury heard evidence that defendant and Vargas had a physical confrontation just a few hours before Vargas’ body was found. The jury also heard defendant’s own statement where he described both his plan to kill Vargas in retaliation for his taking defendant’s cane in the earlier fight and his successful execution of this plan. The prosecutor’s statement that only one inference could be drawn from these facts was argument of a reasonable inference from the evidence adduced at trial. See 
People v. Cloutier
, 156 Ill. 2d 483, 508 (1993).

Moreover, as the State correctly points out, the prosecutor’s remarks were made in direct response to defendant’s closing argument. During his closing argument, defense counsel argued:

“The real murderer waited in another location. The real murderer was a robber, was a robber who came in there, struck Mr. Vargas, took his shoes, took whatever he had in his pockets because his pockets were turned out. And the only reason that they, the State[,] is going after Mr. Nieves is because of a previous incident that Mr. Laboy testified about. ***

*** [T]here is no physical evidence connecting our client to this murder. There are no fingerprints found in the truck that he allegedly laid and waited for Mr. Vargas to get home. There was no murder weapon recovered. *** That’s because the real murderer does not sit before you. The real murderer is still out on the street–probably wiped the item off and walked with it, that’s why they couldn’t find the murder weapon.”

The prosecutor’s comments during rebuttal that only one person had a motive to kill Vargas based upon the evidence were properly made in response to defense counsel’s closing argument. See 
People v. Hudson
, 157 Ill. 2d 401, 441 (1993) (the prosecutor may respond to comments by defense counsel that clearly invite a response). Further, because the prosecutor’s comments were invited, they cannot be relied upon as error on appeal. 
People v. Brown
, 172 Ill. 2d 1, 43 (1996).

Finally, even if it could be said that the prosecutor’s remarks were improper, we would still find reversal unwarranted. The evidence of defendant’s guilt was substantial enough that the jury would have returned a verdict of guilty even if the prosecutor had not made this argument. The remarks are not so prejudicial that it is impossible to say whether the verdict of guilt resulted from these comments. See 
Henderson
, 142 Ill. 2d at 323.

Sentencing Errors

Eligibility Phase

Defendant next contends that his sentence of death must be vacated because the State failed to prove beyond a reasonable doubt that he was eligible for the death penalty. Defendant takes issue both with the jury’s finding of eligibility based upon the aggravating factor of two or more convictions for murder and with the trial court’s finding that subsection (1) of New York’s first degree manslaughter statute (N.Y. Penal Law §125.20 (McKinney 1998)) is substantially similar to the Illinois first degree murder statute. Because we conclude that the evidence did not support the jury’s finding of eligibility, we confine our analysis to this issue.

When this court reviews the sufficiency of the evidence at the eligibility phase of a capital sentencing hearing, the standard employed is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish the defendant’s eligibility for the death penalty beyond a reasonable doubt. 
People v. Emerson
, 189 Ill. 2d 436, 474-75 (2000). The State did not come even close to meeting this standard.

The sole aggravating factor advanced by the State for defendant’s death penalty eligibility was that he had been convicted of murdering two or more individuals. See 720 ILCS 5/9–1(b)(3) (West 1996). Section 9–1(b)(3) authorizes the imposition of the death penalty when “the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section [first degree murder] or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section.” 720 ILCS 5/9–1(b)(3) (West 1996). Here, the State contended, and the trial judge agreed, that the New York statute under which defendant was convicted was substantially similar to the Illinois first degree murder statute. The trial judge therefore ruled that defendant’s New York conviction could be used together with the conviction for first degree murder in the present case to establish defendant’s eligibility for the death penalty under section 9–1(b)(3).

Unfortunately, the State failed to present any competent evidence as to the particular New York statute under which defendant was convicted. To be sure, the State introduced a certified copy of defendant’s New York conviction, which unequivocally states that, on November 18, 1994, defendant pleaded guilty to and was convicted of “the crime of manslaughter [in the first degree].” By itself, however, this evidence is insufficient to establish defendant’s eligibility under section 9–1(b)(3), as the certified copy of defendant’s New York conviction fails to delineate the particular subsection of the first degree manslaughter statute under which defendant was convicted. This omission is critical, as the New York first degree manslaughter statute contains four subsections, only the first of which reasonably could be construed as “substantially similar” to the Illinois first degree murder statute:
(footnote: 1)
 “A person is guilty of manslaughter in the first degree when:

(1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or

(2) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance ***. ***; or

(3) He commits upon a female pregnant for more than twenty-four weeks an abortional act which causes her death, unless such abortional act is justifiable ***; or

(4) Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person.” N.Y. Penal Law §125.20 (McKinney 1998).

Even a cursory reading of the above statute reveals that, if defendant’s 1994 guilty plea was entered under subsection (2), (3), or (4), defendant’s resulting conviction could not form the basis for death penalty eligibility under section 9–1(b)(3).

Recognizing the conviction certificate’s deficiency, the State introduced additional evidence to prove that defendant in fact pleaded guilty to and was convicted of violating subsection (1) of the New York manslaughter statute. The sum total of that evidence consists of the following exchange between Assistant State’s Attorney Maureen Ferrick and witness Cynthia Sippnick, a New York assistant District Attorney who was present for defendant’s confession and “followed the prosecution” of defendant’s case:

“Ferrick: What portion of the statute did the defendant, Nieves, plead guilty to?

Sippnick: He pled guilty under the first subsection.”

On this testimony, and nothing more, the jury concluded that defendant was convicted of violating subsection (1) of the New York first degree manslaughter statute and therefore was eligible for the death penalty under section 9–1(b)(3).
(footnote: 2)
 Stated simply, the State’s “evidence” concerning the particular subsection of the first degree manslaughter statute under which defendant was convicted amounts to no evidence at all. How does Sippnick possess this knowledge? Was she present in open court when defendant entered his guilty plea? Was she a participant in the plea negotiations? Did another assistant District Attorney tell her? Did she review defendant’s prosecution file? Did defendant actually enter the plea, or did his counsel enter it on his behalf? Did she, in fact, have any basis for this assertion? Neither this court nor the sentencing jury has any way of knowing the answers to these questions, as the State failed to introduce any evidence concerning the basis of Sippnick’s naked assertion. Notably, in response to defendant’s assertion that the State was obligated to corroborate Sippnick’s conclusory testimony with either a transcript from defendant’s guilty plea hearing or a certified copy of the New York charging instrument, the State responds:

“A transcript would not necessarily have revealed which subsection the defendant pled guilty to. It is entirely possible that the transcript would have revealed no more, and perhaps substantially less, than what is revealed in [defendant’s videotaped confession]. No importance would attach, under New York law, to the subsection under which defendant pled, and it is likely as not that the transcript might not have made any reference to it whatsoever. Likewise, a certified copy of the New York charging instrument would have proved nothing with respect to what offense defendant 
pled
 guilty to. In fact, the certified copy of conviction *** reveals that defendant was indicted for the highest offense–second degree murder, and pled to the lesser offense of first degree murder.” (Emphasis in original.)

Far from helping the State’s cause, this passage begs a very important question: If neither a transcript from defendant’s guilty plea hearing nor the New York charging instrument reveals the particular subsection under which defendant pled guilty, how exactly did Sippnick come to possess this information? The fact is that we, like the sentencing jury, have no idea, as the State offered no evidence whatsoever on that very crucial point.

The facts of this case bear a striking resemblance to those presented in 
People v. West
, 187 Ill. 2d 418 (1999). In 
West
, as in this case, the State sought to establish the defendant’s death penalty eligibility under section 9–1(b)(3). By way of proof, the State introduced a certified copy of the defendant’s 1978 murder conviction, entered upon a plea of guilty. The conviction certificate failed to identify, however, whether the defendant pleaded guilty to intentional murder, knowing murder, or felony murder. Moreover, the State failed to introduce any additional evidence as to the defendant’s 
mens rea
 at the time of the earlier murder. In holding that the State failed to meet its burden of proving beyond a reasonable doubt that the defendant was eligible for the death penalty under section 9–1(b)(3), this court stated:

“We simply lack any evidence of record that establishes under what theory of murder defendant was charged or convicted. Indeed, our review of the record reveals that not one scintilla of evidence was ever presented to the jury during the State’s case in chief during the eligibility phase of the hearing with respect to the issue of defendant’s 
mens rea
 at the time of the [earlier] murder.” 
West
, 187 Ill. 2d at 442.

Admittedly, unlike in 
West
, the State in this case 
did
 introduce one scintilla of evidence relating to the particular theory of first degree manslaughter under which defendant was convicted. However, even when construed in a light most favorable to the State, that evidence amounts to nothing more than Sippnick’s naked assertion concerning the particulars of defendant’s guilty plea, which assertion may or may not be rooted in verifiable fact. On so slender a reed, no rational jury could have concluded, 
beyond a reasonable doubt
, that defendant pleaded guilty under subsection (1) of the New York first degree manslaughter statute, as opposed to one of the three remaining subsections of that statute. We therefore reverse the imposition of defendant’s death sentence and remand this cause to the circuit court for the imposition of a sentence other death. See 
West
, 187 Ill. 2d at 447-48.

Because our ruling on this issue is dispositive, we need not address defendant’s remaining contentions of sentencing error.

CONCLUSION

For the reasons stated, we affirm defendant’s conviction but vacate defendant’s death sentence and remand to the circuit court for a new sentencing hearing.

Conviction affirmed;

 death sentence reversed;

cause remanded for resentencing.

JUSTICE HEIPLE, specially concurring:

I agree with the majority’s decision to affirm defendant’s conviction for first degree murder. I further agree that defendant’s death sentence must be vacated. However, I base this second conclusion on other grounds.

The sole aggravating factor advanced by the State for defendant’s death penalty eligibility was that he had been convicted of murdering two or more individuals. 720 ILCS 5/9–1(b)(3) (West 1996). Section 9–1(b)(3) of the Criminal Code authorizes the imposition of the death penalty when “the defendant has been convicted of 
murdering
 two or more individuals under subsection (a) of this Section [first degree murder] or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section.” (Emphasis added.) 720 ILCS 5/9–1(b)(3) (West 1996). Defendant contends that his conviction for manslaughter in New York cannot be used to find him eligible for the death penalty because section 9–1(b)(3) clearly states that a defendant must have been convicted of “murdering” two or more individuals.

This court’s primary objective when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature. 
People v. Robinson
, 172 Ill. 2d 452, 457 (1996). An inquiry into the legislative intent behind a statute must necessarily begin with the language of the statute. 
People v. Chandler
, 129 Ill. 2d 233, 253 (1989). The statutory language must be given its plain and ordinary meaning, and where that language is clear and unambiguous, the court must apply the statute without further aids of statutory construction. 
Robinson
, 172 Ill. 2d at 457. Because the construction of a statute is a question of law, this court’s review is 
de novo
. 
Robinson
, 172 Ill. 2d at 457. 

In drafting section 9–1(b)(3), the General Assembly specifically chose to use the word “murder.” Murder is a term of art describing a specific crime. Had the General Assembly intended for homicides not resulting in murder convictions in other states to trigger death penalty eligibility, the legislature would have used a broader term such as “killing” or “homicide.” Instead, the General Assembly specifically required that a defendant be convicted of “murdering” two of more individuals.

The legislature’s intent in section 9–1(b)(3) is clear and unambiguous: in order for a defendant to be eligible for the death penalty, he must have been convicted of 
murdering
, and not simply killing, two or more people. Defendant’s conviction from New York, upon which his death penalty eligibility was predicated, however, was not for murder but for manslaughter. Thus, defendant does not meet the death penalty eligibility requirements under section 9–1(b)(3) and is entitled to the vacation of his death sentence and a new sentencing hearing.

JUSTICE BILANDIC joins in this special concurrence.

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority that the defendant’s conviction for first degree murder must be affirmed. I do not agree, however, with the majority’s separate holding that the defendant was not properly found eligible for the death penalty. In my view, the evidence was sufficient to sustain that finding.

The State based the defendant’s eligibility for the death penalty on the multiple-murder aggravating circumstance found in section 9–1(b)(3) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(3) (West 1996)). That statute authorizes imposition of the death penalty on a defendant who has been found guilty of first degree murder under the following conditions:

“[T]he defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another[.]”

The defendant was convicted in New York in 1994 of manslaughter in the first degree. At the sentencing hearing below, the State contended, and the trial judge agreed, that the New York statute under which the defendant was convicted was substantially similar to the Illinois first degree murder statute. The trial judge therefore ruled that the defendant’s New York conviction could be used together with the conviction for first degree murder in the present case to establish the defendant’s eligibility for the death penalty under section 9–1(b)(3). At the conclusion of the first stage of the hearing, after the introduction of evidence of the defendant’s New York conviction, the jury found that the defendant was eligible for the death penalty under the multiple-murder aggravating circumstance.

Regarding the jury’s eligibility finding, the majority believes that the evidence did not establish, beyond a reasonable doubt, the defendant’s conviction in New York of an offense similar to the Illinois offense of first degree murder. I disagree. The State introduced a certified copy of the defendant’s New York conviction for manslaughter in the first degree. Although the document did not reveal which particular subsection of the New York statute formed the basis for the defendant’s conviction, an assistant District Attorney from New York, Cynthia Sippnick, testified that the defendant was convicted under subsection (1).

The New York statute defining the offense of manslaughter in the first degree provides:

“A person is guilty of manslaughter in the first degree when:

(1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or

(2) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance ***. ***; or

(3) He commits upon a female pregnant for more than twenty-four weeks an abortional act which causes her death, unless such abortional act is justifiable ***; or

(4) Being eighteen years or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person.” N.Y. Penal Law §125.20 (McKinney 1998).

In the proceedings below, the trial judge ruled that the defendant’s conviction had to be based on subsection (1) of the New York statute if the State was to use it to establish the defendant’s commission of an offense substantially similar to the Illinois offense of first degree murder. I believe that the evidence was sufficient to establish the defendant’s conviction under subsection (1). Assistant District Attorney Sippnick testified, without objection, that that provision formed the basis for the defendant’s conviction. It is clear that the defendant’s New York homicide did not involve the circumstances described by subsections (3) or (4) of the statute–the defendant was not performing an abortional act, and the victim was not under the age of 11. In addition, the defendant’s conviction under subsection (1), as testified to by Sippnick, is entirely consistent with the circumstances of the offense. According to the statements the defendant later gave authorities, the victim in the New York case was another homeless man, called Cano, whom the defendant had known for several weeks. The two resided in Central Park. On the day of the homicide, the defendant and Cano got into an argument when Cano refused to share his drugs with the defendant. Cano, armed with a knife, threatened to kill the defendant unless the defendant left. The defendant backed away, and Cano put down the knife and injected himself with drugs. The defendant then returned, picked up Cano’s knife, and stabbed Cano in the neck.

In discounting the State’s evidence, the majority opinion poses a number of questions regarding the foundation for Assistant District Attorney Sippnick’s testimony. Slip op. at 17. These are all matters that the defendant could have raised at the sentencing hearing, but did not. Although the burden rests on the State to establish a defendant’s eligibility for the death penalty, in this case the defendant’s failure to raise any objection to the State’s mode of establishing the conviction is significant and should result in the waiver of the hearsay objection he now makes to the evidence. Notably, the defendant does not dispute the accuracy of the assistant District Attorney’s testimony that he pleaded guilty to, and was convicted under, subsection (1) of the statute. There is nothing inherently improper about the State’s proof of the defendant’s conviction under that provision of the New York statute; unchallenged at the hearing, the evidence should be considered sufficient on review.

FOOTNOTES
1:     
1
Defendant, of course, argues that 
no portion
 of the New York first degree manslaughter statute is “substantially similar” to the Illinois first degree murder statute. We need not address this issue, however, as the State failed to prove beyond a reasonable doubt the particular subsection to which defendant pleaded guilty.

2:     
2
Admittedly, after reviewing defendant’s conviction certificate, Sippnick testified that she possessed “personal knowledge that in fact [defendant] was convicted of [first degree manslaughter].” This, however, is a far cry from possessing personal knowledge of the 
particular subsection
 to which defendant pleaded guilty.