2019 IL App (1st) 171619-U

No. 1-17-1619

Order filed December 13, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12420 |
| | ) | |
| JOSE GREEN, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for criminal sexual assault and aggravated criminal sexual abuse over his contention that the trial court abused its discretion in admitting other-crimes evidence.

¶ 2    Following a jury trial, defendant was convicted of five counts of criminal sexual assault and two counts of aggravated criminal sexual abuse. He was sentenced to a total of 25 ½ years in prison: consecutive four and a half year terms for each count of criminal sexual assault, and concurrent three-year terms on each count of aggravated criminal sexual abuse, to be served

consecutively to his sentences for criminal sexual assault. On appeal, defendant contends that the trial court abused its discretion by admitting other-crimes evidence. We affirm.

¶ 3    Defendant was charged by indictment with 10 counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012); 720 ILCS 5/11-1.20(a)(4) (West 2012)) and 18 counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(ii) (West 2012); 720 ILCS 5/11-1.60(d) (West 2012); 720 ILCS 5/11-1.60(f) (West 2012)). The counts alleged that on and between March 31, 2013, and May 26, 2014, defendant committed various sexual acts on K.P.

¶ 4    Prior to trial, the State filed a written motion to admit evidence of two prior instances where defendant was accused of committing sexual acts on children to establish absence of mistake, intent, and to show the circumstances of defendant's arrest.

¶ 5    Defendant objected to the State's motion, arguing in a written response that the additional allegations were not sufficiently similar to the charges and that their probative value was outweighed by their prejudicial effect.

¶ 6    At the hearing on the motion, the State represented that on December 26, 2004, defendant placed his tongue in his then two-year-old niece's mouth, licked her face, and told her to "suck his penis" while she was at his home on South Lamon Avenue. The victim, G.S., disclosed this information to her mother and again at a hospital, but did not do so to a victim sensitive interviewer. The State also represented that between 1996 and 1997, defendant took K.C., his then six-year-old niece, into a back room at his Lamon address and touched her vagina over her clothes. On another occasion, defendant attempted to place K.C.'s hand on his penis and offered her a dollar to touch his penis. K.C. informed her mother and the police about defendant's conduct on February 13, 2005, while they investigated G.S.'s allegations. The State argued these uncharged instances were

admissible because they occurred in the same location and involved minor females with familial relations to defendant.

¶ 7    The defense argued that the other allegations against defendant were not prosecuted and that admitting them would force them to defend against multiple charges, confuse the trier of fact, and greatly prejudice defendant.

¶ 8    The trial court clarified that the State was moving to admit the evidence pursuant to section 115-7.3 of the Illinois Code of Criminal Procedure (725 ILCS 5/115-7.3 (West 2016)), noting that the correct standard is whether the prejudicial effect of the other-crimes evidence substantially outweighs its probative value. The court then found that G.S.'s allegations were not probative of defendant's propensity to commit sex crimes against young girls because they were "too speculative" where she denied the allegations to some people during the investigation. However, the court found that K.C.'s allegations, although older, were more probative of defendant's propensity to commit the current offense because they occurred at the same location and involved someone in a familial-type relationship with him.

¶ 9    At trial, K.P., who was born on February 4, 2000, testified that she refers to her mother's boyfriend, Erick Gregg, as "dad." K.P. met defendant, Gregg's father, in 2007. She identified defendant in court as her stepfather's father. Prior to defendant's wife's passing in January 2013, K.P. only saw defendant on special occasions. After she passed, defendant told K.P. he was lonely and asked for help around his house. K.P. began spending time with defendant, who contacted her by calling Gregg or her mother and would pick K.P. up in his vehicle to bring her to his home.

¶ 10    On March 30, 2013, K.P. and her cousins slept over at defendant's home. The next night, K.P.'s cousins left, but defendant asked K.P. to spend another night with him. K.P. planned to

sleep on a futon in the study, but defendant asked her to sleep in bed with him. K.P. awoke in the night to defendant rubbing her vagina over her clothes. She told him to stop, which he did after a couple of minutes. The next day, defendant apologized to K.P. saying she could not tell anyone what happened because it would "ruin the family," which was the only family he had after his wife passed, and he would kill himself.

¶ 11    A couple of weeks later, defendant asked K.P. to sleep over in his bed. In the night, defendant touched K.P.'s vagina under her clothes, "rubbing and fingering" her. The next day, defendant again asked K.P. not to tell anyone, adding "that it was okay because [they] weren't related by blood," and "he was teaching [her] and nobody else could teach [her] what he taught [her]."

¶ 12    Two weeks later, K.P. again slept at defendant's house. While she was sitting on the bed, defendant pushed her onto her stomach, pulled her pants and underwear off, removed his pants, told her to be quiet, and put his penis into her vagina. Defendant put one arm on K.P.'s breast and the other on her mouth. K.P. tried but was unable to move defendant off her. K.P. recalled that this interaction "hurt really bad." Afterwards, defendant brought K.P. into the bathroom, took an "ear wax bulb" out of his medicine cabinet, filled it with water, and told K.P. to rinse her vagina with it so that she would not get pregnant. K.P. used the bulb as he directed and noticed that her vagina was bleeding. She identified the State's Exhibit 1 as the "pump" she used at defendant's house. K.P. did not sleep that night. The next day, defendant repeated that K.P. could not tell anyone what happened because it would ruin the family and he would kill himself.

¶ 13    Over the next year, K.P. went to defendant's home 30 to 40 times. Defendant had moved to an apartment on North Maplewood Avenue. On those occasions, defendant placed his penis

inside K.P.'s vagina and mouth and his mouth on K.P.'s vagina and breasts. K.P. regularly used the ear wax kit. One day, defendant told K.P. to fill the bulb "with Coke Cola because Coke Cola kills sperm."

¶ 14    On May 26, 2014, K.P., for the first time ever, called defendant to ask if she could use his Sam's Club card to purchase candy for a fundraiser. On the way home, defendant took his uncircumcised penis out of his pants, began rubbing it, pulled up K.P.'s dress, and placed his finger in her vagina. After that date, K.P. did not spend any time alone with defendant at his home. K.P. did not tell anyone about these incidents.

¶ 15    On June 10, 2014, K.P. skipped school for the first time because the night before she was very sad and "had a bad dream that it happened again." On June 11, 2014, a dean at K.P.'s school said he noticed a change in her and asked what was going on. K.P. "wanted to tell somebody about what was happening so [she] chose to tell him." K.P.'s school called her mom, who K.P. did not want to tell about the abuse because she knew it would hurt her.

¶ 16    On cross-examination, K.P. testified that she did not know what kind of relationship Gregg had with defendant, but noted that they worked together and she thought they were close. K.P. did not know of any fighting going on between members of her family. She explained that around the time that she skipped school, she was hanging out with some older people, which defendant told her not to because she "was obligated to him."

¶ 17    On redirect examination, K.P. testified that she did not make up this story about defendant in order to avoid getting in trouble for missing school. She stated that she is afraid of defendant, and that on the day that she called defendant to go to Sam's Club she thought that her dad would come with her.

¶ 18    K.P.'s mother, Alicia Scott, testified that defendant always contacted her and asked for K.P. to come over. Scott did not initiate these stays.

¶ 19    On cross-examination, Scott testified that K.P. stayed at defendant's house once prior to his wife's passing. K.P. went to defendant's house more than once a month and defendant sometimes took her shopping. Scott did not notice any changes in K.P. during this time, nor did she notice any inappropriate behavior between defendant and K.P.

¶ 20    Dawn Marie Cicero, a registered nurse, testified that on June 12, 2014, she treated K.P, who told her that she had been "sexually penetrated by her mother's boyfriend's father from March 31, 2013 to February, 2014," and was "fondled on Memorial Day." Cicero described K.P. as "withdrawn but matter of fact about what happened." A sexual assault kit was not administered to K.P. because too much time had passed from the time of the assault.

¶ 21    Detective Anthony Noradin testified that on June 30, 2014, he executed a search warrant at a residence on Maplewood with the purpose of finding a cellphone and an ear wax removal kit. Noradin found the kit in the bathroom medicine cabinet.

¶ 22    Steven Swain, an evidence technician, testified that he went to the Maplewood address to photograph the medicine cabinet and ear wax removal kit. After taking photographs, Swain, wearing gloves, placed the ear wax removal kit inside a paper bag and brought it to a police facility, sealed it, and assigned it an inventory number. The evidence was picked up by the evidence coordinator.

¶ 23    The State entered stipulations that Exhibits 6 and 7 show that buccal swabs from defendant and K.P. were properly collected, sent to Forensic Services, inventoried according to procedure, transported for testing, and that a proper chain of custody was maintained.

¶ 24    Elizabeth Zawicki, a forensic scientist, testified that she performed three different tests for semen on the ear wax bulb and the tests were positive. On cross-examination, Zawicki testified that there was no way to tell when the semen was deposited. On redirect examination, Zawicki testified that it was possible the semen was deposited within the last few years.

¶ 25    Angela Kaeshamer, a forensic scientist, completed a "differential extraction" on the ear wax bulb, finding that K.P. could not be excluded from the major female DNA profile and stated that the chance a random person would have that DNA profile is "one in 3.9 quintillion black, one in 16 quintillion white, or one in 1 sextillion Hispanic unrelated individuals." Defendant could not be excluded from the minor male DNA profile and she stated that the chance a random person would have that DNA profile is "one in 73 million black, one in 23 million white, or one in 28 million Hispanic unrelated individuals."

¶ 26    On cross-examination, Kaeshamer explained that DNA can be transferred in many ways, could remain through cleanings, and that her tests did not indicate how or when the DNA got on the bulb.

¶ 27    On redirect examination, Kaeshamer testified that if the semen on the bulb was not from defendant, she would have expected another male profile in the DNA data, which there was not.

¶ 28    K.C. testified that she and her family used to live next to defendant and would see him a couple times a week. When K.C. was around six or seven years old, defendant began asking her to go into the "back room." There, he would pick her up between her legs, hold her in the air, and rub her vagina over her clothes. Other times, defendant grabbed K.C.'s hand to try to force her to touch his penis and offered her a dollar to do so. When K.C. was 15 years old, she told her mother about these incidents.

¶ 29    On cross-examination, K.C. testified that she does not remember the exact dates of these incidents. Defendant never invited K.C. over alone, threatened to kill himself, or said that the family would break apart if she told anyone about the incidents. The State rested.

¶ 30    The defense stipulated that Detective Noelia Herrera interviewed K.P. and authored a report that did not include K.P.'s allegation that defendant told her that he did not want her hanging out with other men out of obligation to him or that he told her to clean herself with cola. The defense entered into stipulation that Detective Arlen Pietrowski interviewed K.C. and authored a report that did not include K.C.'s allegation that defendant threw her in the air or performed sexual acts while her family was in the house.

¶ 31    Defendant testified that Gregg was upset with how defendant distributed his late wife's property and life insurance policy proceeds and with who defendant dated. Gregg or K.P. initiated K.P.'s visits to defendant's home, which became more frequent because she liked going to church with him. Defendant treated K.P. as a grandchild. He denied ever touching her inappropriately, specifically stating that she did not sleep over alone on the weekend of March 30, 2013, that he did not touch himself or her during their trip to Sam's Club, and that he did not tell her to use the ear wax bulb to clean herself. He explained that he has masturbated in the bathroom where the bulb was kept and then washed his hands in the sink.

¶ 32    On June 10, 2014, Gregg told defendant that K.P. was missing so defendant went with Gregg to look for her. Prior to this incident, defendant had concerns about who K.P. was hanging out with "[b]ecause they were well over high school age and she was only 13." Defendant's concerns caused tension in his relationship with Gregg.

¶ 33 Defendant denied that he was ever alone with K.C., offered her money to touch his penis, threw her in the air, or grabbed her vagina. Defendant said K.C.'s allegations, which Gregg was aware of, "ripped [his family] apart a little bit," and greatly upset his wife.

¶ 34 The jury found defendant guilty on five counts of criminal sexual assault and two counts of aggravated criminal sexual abuse. Defendant moved for a new trial and for judgment notwithstanding the verdict, relying on his objection to the court's admission of other-crimes evidence. The court denied defendant's motions and sentenced him to 25 ½ years in prison.

¶ 35 On appeal, defendant contends that the trial court erred when it allowed K.C. to testify about her allegations against him. Defendant argues that the trial court did not conduct the meaningful assessment required prior to admitting other-crimes evidence because it focused on minimally relevant similarities between the past crime and the charged offense without considering the unfair prejudice the evidence posed to him.

¶ 36 Under the common law, other-crimes evidence is generally inadmissible to demonstrate a defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). This is not because it is irrelevant; rather, it is because it may lure the trier of fact into convicting a defendant based on past behavior and a defendant is entitled to have his verdict determined solely based on the charged crime. *Id.* Other-crimes evidence is admissible to prove intent, identity, motive, absence of mistake, and *modus operandi*. *Id.* Even if the other-crimes evidence is offered for a permissible purpose, it will not be admitted if its prejudicial impact substantially outweighs its probative value. *Id.* Other-crimes evidence, or prior bad acts evidence, encompasses misconduct that may not rise to the level of a criminal offense. *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 35.

¶ 37    The Illinois legislature created an exception to the common law bar against the use of other-crimes evidence to show propensity in cases where, as here, a defendant is accused of criminal sexual assault. Pursuant to section 115-7.3 of the Code, evidence of certain other sex offenses is admissible to prove a defendant's propensity to commit the charged sex offense so long as the probative value of the evidence outweighs its undue prejudicial impact. 725 ILCS 5/115-7.3 (West 2016). This section provides:

> "(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> > (1) the proximity in time to the charged or predicate offense;
> >
> > (2) the degree of factual similarity to the charged or predicate offense; or
> >
> > (3) other relevant facts and circumstances."

*Id.*

¶ 38    We will not reverse the trial court's decision to admit other-crimes evidence absent an abuse of discretion. *Donoho*, 2014. Ill 2d at 182. Under this highly deferential standard of review, a trial court abuses its discretion when its decision is arbitrary, fanciful, or so unreasonable that no rational person would adopt the same view. *Id.*

¶ 39    Here, because the trial court appropriately weighed the proximity in time, factual similarity, and relevant circumstances between the two offenses, we find that it did not abuse its discretion. Prior to ruling on the State's motion to admit testimony from G.S. and K.C., the court first pointed out the correct standard for admissibility of other crimes evidence. The court then analyzed the underlying facts and circumstances of the previous allegations against defendant. In doing so, the court considered the inconsistency in G.S.'s allegations and determined they should not be

admitted. Turning to K.C.'s allegations, the court noted that, although they were older than G.S.'s, they took place at the same location and similarly involved a familial relationship as the current offense. In keeping out G.S.'s testimony but admitting K.C.'s, the court clearly demonstrated its consideration of the prejudicial impact of the evidence, limiting it to the most probative of defendant's propensity to commit the charged offense.

¶ 40    The record shows that there were several similarities between K.C.'s and K.P.'s experiences with defendant. Both girls had familial-type relations to defendant: K.C. was defendant's niece and K.P. was treated as his granddaughter. Both girls were below consenting age at the time of defendant inappropriately interacted with them: K.C. was six or seven years old and K.P. was 13 years old. Moreover, both girls alleged that defendant initiated sexual contact with them by rubbing their vaginas over their clothes, which occurred at defendant's home address while defendant was alone with them. Given this record, we cannot say that the court's decision is arbitrary, fanciful, or so unreasonable that no rational person would adopt the same view. See *id.*

¶ 41    Nevertheless, defendant argues the trial court improperly admitted K.C.'s testimony. First, he notes the time gap between K.C.'s allegations and the charged offense. We consider the proximity in time between a past crime and the charged offense on a case-by-case basis. *Id.* at 183. While the probative value of other-crimes evidence may decrease with the passage of time (see *id.* at 184), "the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged." *People v. Illgen*, 145 Ill. 2d 353, 370 (1991). Courts have found decades-old other-crimes evidence admissible where it is sufficiently credible and probative. See, *e.g.*, *Donoho*, 204 Ill. 2d at 184 (12 to 15 years between the offenses); *People v. Smith*, 2015 IL App (4th) 130205, ¶ 29 (12 to 18 years

between the offenses); *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994) (over 20 years between the offenses).

¶ 42  In this case, K.C.'s incidents with defendant happened more than a decade before K.P.'s incidents. However, K.C.'s allegations contained specific details concerning defendant's acts and remained consistent, thus making them credible and probative. As such, the incidents with K.C. were not too remote to be admissible.

¶ 43  Defendant next argues that the other-crimes evidence was too factually dissimilar to be admissible because K.C. was only six or seven when she was touched inappropriately by defendant and K.P. was 13 or 14 when she was assaulted by him. Other-crimes evidence must have some threshold level of similarity to the charged offense. *Donoho*, 204 Ill. 2d at 184. As the factual similarities between the other-crimes evidence and the charged offense increase, so does its relevance and probative value. *Id.* Conversely, as the factual dissimilarities increase, so does the prejudicial effect. *People v. Johnson*, 406 Ill. App. 3d 805, 811 (2010). Where other-crimes evidence is not offered to prove *modus operandi*, only general areas of similarity suffice to support its admissibility. *Donoho*, 204 Ill. 2d at 184.

¶ 44  Here, K.C. was defendant's actual niece, while K.P. was treated as defendant's granddaughter, both victims were young girls, and both assaults involved defendant touching the victims' vaginas over their clothes and occurred at defendant's home when he was able to be alone with them. Therefore, even if every factual detail between the assaults is not identical, the similarities are enough to support the court's decision to admit K.C.'s testimony. See *id.* at 185 ("[t]he existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical"); *e.g.*, *People v. Cerda*, 2014

IL App (1st) 120484, ¶¶ 189-90 (affirming admittance although prior offense did not involve intercourse and offense at issue did); *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 41 (affirming admittance although prior offense involved intercourse and offense at issue did not).

¶ 45   Last, defendant points out that K.C.'s allegations were never prosecuted. However, Illinois courts have repeatedly admitted other-crimes evidence involving only uncharged allegations. See, *e.g.*, *People v. Arze*, 2016 IL App (1st) 131959, ¶ 101 (noting that Illinois courts have "found the admission of other-crimes evidence to be proper regardless of any conviction or charges relating to the offenses in the other-crimes evidence"); *Braddy*, 2015 IL App (5th) 130354, ¶ 43; *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 45.

¶ 46   Moreover, we briefly note that, even if K.C.'s testimony was improperly admitted, the error was harmless. "[I]mproper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). Excluding K.C.'s testimony, the State presented ample evidence for the jury to find defendant guilty beyond a reasonable doubt. K.P. gave detailed accounts of defendant's assaults on her. *People v. Gray*, 2017 IL 120958, ¶ 36 ("The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant."). In addition, K.P. testified that defendant instructed her to use the ear wax removal kit's bulb to clean his sperm from inside her vagina. This account was corroborated through the State's witnesses. Noradin testified that he found the ear wax removal kit in the bathroom medicine cabinet, Zawicki testified that the kit's bulb tested positive for semen, and Kaeshamer testified that K.P. and defendant fit the DNA profiles found on the bulb. Because

of this overwhelming evidence, K.C.'s testimony neither prejudiced defendant nor denied him a fair trial, and thus, any error in admitting it was harmless. See *Nieves*, 193 Ill. 2d at 530.

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48    Affirmed.