2020 IL App (1st) 180198
No. 1-18-0198
Order filed April 27, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 3867 |
| | ) | |
| JEREMIAH CHERRY, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Griffin and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's convictions for criminal sexual assault and unlawful use of a firearm by a felon where: (1) the record did not rebut the presumption that the trial judge relied only on competent evidence in finding him guilty; and (2) any improper reliance on other crimes evidence would be harmless error, given the other evidence of defendant's guilt.

¶ 2    Defendant Jeremiah Cherry was convicted of criminal sexual assault 720 ILCS 5/11-120(a)(1) (West 2012) and two counts of unlawful use or possession of a weapon by a felon (UUWF) (720 ILCS 5/24.1.1(a) (West 2012)), and sentenced to consecutive terms of 10 and 7 years' imprisonment, respectively. On appeal, Cherry contends that he was deprived of a fair

trial by the admission of other crimes evidence, notwithstanding the trial court's statements that it did not rely on this evidence in reaching its verdict.

¶ 3     We affirm. The issue on appeal is not whether the other crimes evidence was improperly admitted, but whether the court improperly *relied* on it, causing prejudice to Cherry. After a thorough review of the record, we cannot say that it amounts to an "affirmative showing" that the trial court actually relied on evidence of other crimes. Rather, the trial court's ruling makes clear that it relied on the competent evidence of the sexual assault in finding Cherry guilty. In addition, given the ample evidence of the sexual assault, we have no reason to doubt that Cherry would have been convicted, even had the trial court never heard any evidence regarding the other crimes evidence.

¶ 4                                          Background

¶ 5     Cherry was charged by information with one count of criminal sexual assault of K.B. and two counts of UUWF in connection with events that occurred in January 2013. Before trial, the State filed a "motion to allow other crimes evidence" under section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2014)), concerning evidence of Cherry's July 2012 sexual assault of another woman, T.P. At a pretrial hearing, the trial court granted the State's motion, finding "substantial similarities between the two offenses."

¶ 6     At trial, K.B. testified that in January 2013, she went on a trip to Chicago following her graduation from college in Michigan. She stayed with a cousin on her father's side. K.B. also had relatives in Chicago on her mother's side, including two cousins, T.R. and Cherry. K.B. had not previously met them.

¶ 7   Cherry's mother put K.B. in contact with Cherry. K.B. and Cherry made plans to go "paint ball shooting." Cherry picked K.B. up in a car, with two other men whom she had never met. Cherry drove the group to his home, where they began "chilling a little, partying," drinking and smoking marijuana. K.B. drank some vodka, but she was not intoxicated. She saw other people in the group use the drug "molly" (a term for methylenedioxymethamphetamine, also known as "ecstasy"). K.B. declined to take any. K.B. observed a younger woman at the home, N.T., who was "intoxicated" to the point that she "didn't know what was going on around her."

¶ 8   K.B. recalled seeing a handgun as well as a larger gun that looked like an AK-47. Cherry and one of his friends were "playing with the guns and taking pictures with the guns." Cherry referred to them as his "toys." K.B. identified People's Exhibits 1 and 2 as firearms that appeared to be the same weapons she saw in the home.

¶ 9   At one point, K.B. saw two men taking N.T. to a bedroom. K.B. felt uncomfortable because she did not "believe [N.T.] knew what was going on with the two guys that were with her." K.B. went to a restroom and texted T.R. because she wanted to leave. When she came out of the bathroom, K.B. heard Cherry state: "I'm going to f*** my cousin." K.B. responded "no, you're not."

¶ 10   K.B. returned to the bathroom and tried to call either R.T. or her sister. She was "trying to get in contact with somebody" because she wanted to leave. When K.B. left the bathroom, Cherry "was standing there" and "blocked" her. She and Cherry began "tussling." Cherry pushed K.B. into another bedroom and onto the bed. Cherry and K.B. began "fighting over [her] pants and [her] belt," as Cherry tried to pull them down. K.B resisted and told him to stop. Cherry eventually pulled her jeans down; he could not pull them off completely because K.B. was

wearing tall boots. Cherry pushed her legs up toward her chest, so that she "could hardly breathe." She tried to "buck[] him off the bed" and push him away, but he penetrated her vagina with his penis.

¶ 11    During the assault, one of Cherry's friends, Darius Edwards, entered the room and "kind of asked [Cherry] like that's your cousin, you know, like why would you do that, are you serious, he was kind of shocked I guess." K.B. asked Edwards to "get [Cherry] off [her]." Cherry told Edwards to get out and close the door, and Edwards complied.

¶ 12    After the assault, K.B. called T.R., who drove to the house. As soon as she entered T.R.'s car, K.B. began calling relatives in Michigan. K.B. was "a little frantic." K.B. reached a godsister on the phone and told her that she had been raped. When T.R. heard this, she turned the car around and began to drive back toward the house. K.B. stayed in the car. T.R. went into the house for about five minutes. T.R. drove K.B. to her mother's house. K.B. told T.R.'s mother that she had been assaulted. T.R. and T.R.'s mother took K.B. to the police station and then to a hospital, where a criminal sexual assault kit was collected from her.

¶ 13    T.R. testified that Cherry was her cousin and she had known him her whole life. She described K.B. as a "distan[t] cousin" whom she had first met on January 16, 2013. On January 18, K.B. sent her a text message asking to pick her up from the residence where Cherry lived. T.R. had been to that house numerous times, and had her mail sent there.

¶ 14    She drove to the home and texted K.B. When K.B. entered the car, T.R. noticed that she was "very panicky, very emotional, [and] upset." She recalled that K.B. was "rummaging through her phone trying to call people." K.B. eventually reached someone on her phone and said that she was raped. When T.R. heard this, she asked K.B. what happened and K.B.

responded "I will tell you later, I just need to get away from here." T.R. turned the car around and drove back to her aunt's house because she wanted to identify who was at the house. Because K.B. was from out of town, "she wouldn't have recognized them at a later date."

¶ 15    T.R. entered the house while K.B. stayed in the car. Cherry met here at the front door; She then went to the living room "to act like [she] was looking for mail." She noticed four men and one woman, but she did not recognize anyone one besides Cherry. One of the men began to argue with T.R. and "pulled out a gun on [her]" but Cherry intervened and took the gun away from him. People's Exhibit 1 appeared to be the same gun. She left the house and went back to the car, where K.B. was waiting. She drove to her mother's home, and all three later went to the police station and then to the hospital.

¶ 16    The State then proceeded by stipulation. If called, Dr. Rashid Kysia, an emergency room physician, would testify that he examined K.B. on January 18. K.B. told him that she was raped by her cousin at his house. Dr. Kysia noted a tear to the interior vaginal wall and that K.B. had blood in her vaginal vault and in her urine. Dr. Kysia collected a criminal sexual assault kit.

¶ 17    Chicago Police officer McDermott would testify that, on January 18, he went to a residence in response to a reported sexual assault. Cherry answered the door and said "I know what this is all about." Cherry spontaneously stated: "I didn't rape her. I f***ed her. She's my cousin. We had a p**** eating contest." McDermott would testify that there were three other men in the house, who were identified as Trent Peppers, Arthur Moss, and Edwards, as well as a woman, N.T. Edwards and N.T. were having sex when police arrived. N.T. was extremely intoxicated and could not be interviewed. McDermott recovered a loaded semi-automatic rifle

and ammunition from beneath an enclosed porch at the home. Another responding officer would testify that he recovered a semi-automatic pistol beneath the porch.

¶ 18    Through other stipulations, the parties agreed that forensic scientists with the Illinois State Police would testify that DNA collected from K.B.'s criminal sexual assault kit positively matched a DNA sample taken from Cherry.

¶ 19    T.P. testified about a 2012 incident in which Cherry sexually assaulted her. T.P. met Cherry in June 2012. On July 14, 2012, she went with Cherry to a barbecue. She got sick at the barbecue and then went to the home of a man she knew as "Peanut" (later identified as Antwon Hebron). The next day, Cherry told her that he had given her molly without her knowledge. T.P. did not know K.B.

¶ 20    Later on July 15, T.P. was at Peanut's house watching television with his girlfriend and sister. That night, Cherry unexpectedly arrived. He began cursing at her, and hit her. At one point Cherry left the room, and "Peanut and his girlfriend shut the door and locked it." But, Cherry "kicked a hole in the door" to regain entry to the room, and continued to hit her. Cherry later forced T.P. into a car, and drove her to an alley, where he anally and vaginally raped her. Cherry then drove T.P. back to his house, where he beat her, raped her again, and choked her. At one point, she "passed out." When she woke, Cherry again started hitting her. T.P. also testified that Cherry threatened to shoot her and put a gun to her head.

¶ 21    A woman named Toddy arrived, and Cherry told her to take T.P. home. When she was alone with the woman, T.P. told her that Cherry had beaten and sexually assaulted her. The woman took T.P. to a hospital where a criminal sexual assault kit was collected.

¶ 22    The parties stipulated that forensic scientists with the Illinois State Police would testify that Cherry's DNA matched DNA collected from T.P.'s criminal sexual assault kit. The State also introduced a certified copy of Cherry's felony conviction in case 97 CR 0791701 to prove the offense of UUWF.

¶ 23    After the State rested, Cherry's motion for a directed verdict was denied.

¶ 24    The defense called Moss, who testified that he knew Cherry for about two years before the events of January 18, 2013. On that date, Moss was at Cherry's house with Peppers, Edwards, and N.T. Moss explained that people began drinking and smoking marijuana. Moss and Peppers eventually left to pick up K.B., after they "received a phone call from [Cherry's] mother saying his cousin was in town and she wanted to hang out with us." Moss and Peppers brought K.B. back to the house, where people continued talking, smoking, and doing molly.

¶ 25    Cherry, Edwards, and K.B. had a discussion about an oral sex contest, after which they went into a bedroom together. Edwards later came out of the bedroom but left the bedroom door open. Moss could see inside the bedroom and saw Cherry performing oral sex on K.B. Moss testified that Cherry and K.B. came out of the bedroom at the same time. K.B went into the bathroom, and Cherry sat on the living room couch. After about five minutes, K.B. came out of the bathroom and sat on the couch. About 30 to 40 minutes later, another woman whom Moss did not know arrived. The woman was acting "weird" and talking about the mail. K.B. left with the woman. Later, Cherry's mother called and they learned that police may be on the way.

¶ 26    The defense called Antwon Hebron to rebut T.P.'s other crimes testimony. Hebron testified that he has known Cherry for many years. In July 2012, Cherry visited his house with T.P., whom Hebron had not met before. About a day later, T.P. called Hebron and she went to

his house. Shortly thereafter, Cherry arrived; he told T.P. "let's go" and left with her. Hebron denied Cherry kicked in the door, or he ever saw Cherry hit T.P.

¶ 27    Edwards testified that he went to Cherry's house with N.T., whom he described as his "best friend," along with Peppers and Moss. The group, including Cherry, began partying, drinking and using molly. After an hour or two, Peppers and Moss left to pick up K.B. The group, including K.B., continued to talk, drink liquor, smoke marijuana, and use molly. At some point, the group had a "sexual conversation," which got into "a vagina eating contest" between Edwards and Cherry. Edwards, Cherry and K.B. went to a bedroom. After K.B. pulled her pants down, Edwards decided not to participate in the contest and he walked out of the room, leaving the door open.

¶ 28    Edwards went to a nearby room from which he could see into the bedroom. Cherry performed oral sex on K.B. "[A]fter that they started having sex." The atmosphere was "calm" and "never one time did it get aggressively [sic]." Edwards later re-entered the bedroom but he did not intervene because it "looked like they were enjoying themsel[ves.]" Cherry and K.B. eventually returned to the living room. K.B. was "acting normal until [Cherry] exposed the fact that he had sex with his cousin, and her whole vibe changed." About an hour later, K.B.'s cousin came to the house, and K.B's "whole attitude changed" "from a happiness all the way down to a sadness." According to Edwards, the police arrived while K.B. and her cousin were still in the house, and he was having sex with N.T. On cross-examination, Edwards maintained that it was K.B.'s idea to have a "vagina eating contest." He admitted that he had sex with N.T. even though she was intoxicated and could barely walk or talk.

¶ 29    Cherry testified that he and his friends planned to go paintball shooting and to shoot a rap video. Peppers, Edwards, Moss, and N.T. arrived at his house around noon. His mother called and told him that K.B., his cousin from Detroit, wanted to hang out with him. He had never met or spoken to K.B. Moss and Peppers picked up K.B. and brought her back to the house. When they returned, the group started drinking, listening to music, and using molly for "some hours."

¶ 30    At one point, Cherry and Edwards were "debating" and having a "conceited" conversation about who was better at certain things, such as rapping. Eventually, he or Edwards said "I am a better p**** eater than you" and they asked K.B. "if she wanted to be a judge in a p**** eating contest." K.B. agreed, and the three of them went into a bedroom. Cherry testified that K.B. pulled down her pants, and he performed oral sex on her. She "enjoyed" it, and they proceeded to have vaginal sex on the bed. Cherry denied that Edwards said anything to him about having sex with his cousin, or that he told Edwards to leave the room.

¶ 31    After he and K.B. had sex, Cherry went into the living room and "started partying again." K.B. went to the bathroom and then sat down on the living room couch. K.B.'s demeanor was "calm" and "cool." Cherry began "teasing" K.B., calling her "nasty" for having sex with her cousin. K.B. "got kind of embarrassed by it" and he stopped teasing her once he saw "she didn't like me poking fun at her."

¶ 32    Cherry saw K.B. use her phone before T.R. arrived at the house. As soon as T.R. arrived, K.B. left the house. T.R. came inside the house and went to a box where Cherry's mother kept mail. T.R. "fake[d] like she's looking in there for something and then she walk[ed] right out." Cherry denied that T.R. had an argument with anyone. Cherry did not see anyone with a gun in

the home. About an hour after T.R. left the house, Cherry received a phone call from his mother and learned he had been accused of rape. He stayed at the home until police arrived.

¶ 33    During his direct examination, Cherry was also asked about his interactions with T.P. in July 2012. He testified that he invited her to a barbecue at his sister's house. He and T.P. were drinking at the barbecue until they left to go to Hebron's home. There, T.P. was in a "room with ten guys" and "everybody was having sex with her." According to Cherry, T.P. "formed a Team A and a Team B" and had sex with "Team A" before "Team B." Cherry also had sex with T.P. Cherry stayed at Hebron's house all night, went home to sleep, and returned to Hebron's house six or eight hours later. When he came back, the "same thing was going on" with T.P. and "a group of guys." T.P. told Cherry that she "was ready to go," so he drove her back to her home. Cherry denied that he raped or struck T.P.

¶ 34    On cross-examination, Cherry maintained that T.P. had sex with about 20 men. At one point, Cherry was asked: "Did it bother you that the girl that you brought to the barbecue had sex with the whole neighborhood?" Cherry answered: "No. I like sluts. I like sluts more than I like a woman who is not a slut. I love sluts." Cherry was also cross-examined regarding his interactions with K.B. in January 2013. Cherry said that the oral sex contest was "probably" his idea but maintained that she agreed to it.

¶ 35    If called, Detective Russell Sutherland would state that, when he interviewed K.B., she told him that Cherry grabbed her by the arm and told her "we're going to have a p****-eating contest." K.B. "said she told him no and that he attempted to pull her into a bedroom just adjacent to the bathroom." Detective Costello would testify that he investigated the alleged sexual assault of T.P. in July 2012. When Costello interviewed T.P., she had relayed certain

details that T.P. could not recall during her trial testimony, including that Hebron had told Cherry to "chill out" when he first attacked her, and that Cherry had punched T.P. after she refused to hand him a bottle of vodka. The defense rested following these stipulations.

¶ 36    In rebuttal, the State introduced additional stipulations. Detective Sutherland would testify that he spoke to Cherry about the incident involving K.B. Cherry told Sutherland that "he was having a rap battle with [Edwards] and stated the p****-eating contest was to see who was the best rapper." Cherry stated that the "contest was more like a surprise for the participants."

¶ 37    The parties also stipulated that Assistant State's Attorney Anastasia Harper would testify that she interviewed Edwards in the presence of another ASA. Edwards told the ASAs that he had been untruthful in a previous interview with a detective. Edwards recalled that, during the party, Cherry stated "I'm going to f*** my cousin" and K.B. replied "no, you ain't." For two to three minutes, Cherry was "trying to force her into the bedroom" and she was "trying to get away from him." Eventually, Cherry "gained control and threw her on the bed." Cherry "got her pants off and then pushed her legs up while holding her down with his hand on her chest" and then "forced his penis into her vagina." Edwards "started to feel bad" and went into the bedroom "to see if he could talk [Cherry] out of sexually assaulting her." Edwards said to Cherry "man, you gonna do this to your own cousin is that what you on?" Cherry told Edwards to "get the f*** out of my room" and close the door. Cherry told everyone to "get our stories straight." Cherry "came up with the p****-eating contest story" and "everyone agreed to tell the story."

¶ 38    After hearing all of the evidence, but before closing arguments, the trial court explained that it would not rely on the other crimes evidence concerning T.P.

"I originally made a ruling that the evidence of other crimes was applicable in this case. I now know that was a serious mistake. The evidence of other crimes took place at a different point in time, were drastically different than the facts outlined in this case and in this trial the evidence of other crimes became the trial within the trial * * * *. And because of that fact I'm discounting the entire testimony of [T.P.] and I'm discounting the entire testimony of the defense witness [Hebron] that rebutted her testimony."

Thus, the court stated that "[t]his case will be decided based on the testimony of [K.B.], [T.R.] Mr. Moss, Darius [Edwards], the defendant and the stipulations."

¶ 39    Following closing arguments, the trial court found Cherry guilty on all counts. In explaining its decision, the court first found that K.B. "testified not just credibly but highly credib[ly]." The court noted the "way she described the manner in which the defendant used force on her; the fact that she had boots on, jeans, was unable to actually take off all of her clothing so that it was just forced partially down * * * ." The court found that her testimony was "corroborated by vaginal tears and bleeding, circumstantial evidence which proved her to be testifying credibly on that force." The court also found that K.B. was corroborated by T.R., who testified "highly credibly." The court noted T.R. "would have more bias to be on the side of the defendant because she's his first cousin and she hardly knew" K.B., but that her testimony "was credible and backed up" K.B.'s testimony.

¶ 40    With respect to the defense witnesses, the court remarked that Edwards' credibility was "at zero." The court observed that "[h]e was obviously under the influence of something while he was testifying" and had the "worst demeanor I ever saw of any witness that has ever testified

here." The court also noted that Edwards was "impeached by statements that he made to an [ASA] wherein he basically corroborates everything that [K.B.] said and confirms that she was sexually assaulted by the defendant." The court also found that Moss was "impeached" and "not believable." The court then stated:

> "The defendant. What do I say about the defendant's testimony? He's not credible, he said he prefers his wom[e]n to be sluts and he doesn't like a woman who's not a slut. That's exactly the kind of individual with that attitude that would rape his own cousin."

¶ 41 The court found Cherry guilty on all counts. The trial court denied Cherry's motion to set aside the verdict or grant a new trial. In doing so, the court remarked that it had "completely discounted the evidence of other crimes witness[es]."

¶ 42 After a sentencing hearing, Cherry was sentenced to 10 years in prison for criminal sexual assault (count 1), as well as a consecutive 7-year term for UUWF (count 2). He was also sentenced to a concurrent 7-year term on UUWF (count 3), for an aggregate 17-year prison sentence. Cherry's motion to reconsider sentence was denied.

¶ 43                                    Analysis

¶ 44 Cherry contends that he was deprived of a fundamentally fair trial where the trial court admitted "overwhelmingly prejudicial uncharged other crimes evidence" related to T.P. In setting forth this argument, he acknowledges the court's statement that its initial ruling to allow this evidence was a mistake, and that it would be "discounting the entire testimony of T.P." and of Hebron. Nevertheless, he maintains that he was prejudiced by the admission of the other crimes evidence because the trial court referred to his testimony about "sluts." According to

- 13 -

Cherry, this demonstrates that the trial judge "was incapable of disregarding T.P.'s overwhelmingly prejudicial other crimes testimony and evidence" which "clearly contributed to the trial court's guilt adjudications." On that basis, he requests that we reverse his conviction and grant him a new trial.

¶ 45     In response, the State emphasizes that the trial court "explicitly said it would not consider the other crimes evidence." The State argues that the trial court's "passing remark" referencing Cherry's comments about "sluts" is insufficient to show that the court actually relied on other crimes evidence to find him guilty. The State maintains that the record shows that the trial court did not rely on other crimes evidence in finding Cherry guilty but instead relied "on the credible testimony of K.B., which was corroborated both by medical evidence and the credible testimony of [T.R.]." The State otherwise argues that "any possible error here was harmless" given the evidence of Cherry's guilt. We agree with the State.

¶ 46     "In general, evidence of other crimes is not admissible if it is relevant merely to establish defendant's propensity to commit crimes." *People v. Nieves*, 193 Ill. 2d 513, 529 (2000). But, "[s]ection 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2006)) provides an exception to the general rule in criminal cases," permitting evidence that a defendant charged with certain sexual offenses "has committed other sexual offenses to show the defendant's propensity to commit sex offenses." *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 40 (citing *People v. Donoho*, 204 Ill. 2d 159, 176 (2003)). "Like the common law, however, section 115-7.3 permits such evidence to be admitted only if: (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. [Citation.]" *Id.*

¶ 47    A reviewing court will not reverse the trial court's decision to admit other-crimes evidence under section 115-7.3 unless it finds that the court abused its discretion. *Donoho*, 204 Ill. 2d at 182. That, however, is not the precise question raised in this appeal, given the procedural history. The trial court initially admitted other crimes evidence regarding T.P., but at the close of all evidence *sua sponte* acknowledged that its prior ruling was a "serious mistake." The court explicitly said that it would disregard such evidence in deciding the case. Nevertheless, Cherry claims that he was prejudiced because the court improperly relied on such other crimes evidence, despite its statement that it would not do so. Thus, the issue on appeal is not whether the other crimes evidence was improperly admitted, but whether the court improperly *relied* on it, causing prejudice to Cherry.

¶ 48    As recognized by Cherry, "the trial judge, as the trier of fact, is presumed to know the law and to have considered only competent evidence in reaching its determination on the merits in a bench trial. [Citations.]" *People v. Koch*, 248 Ill. App. 3d 584, 592 (1993). Our supreme court has recognized that a trial judge at a bench trial is "capable of compartmentalizing its consideration of evidence." *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989). Thus, although other crimes evidence presents a "danger" that "it may convince a jury to convict the defendant simply because he is a bad person," that "fear is assuaged" in a bench trial, since "it is presumed that the trial court considered the other-crimes evidence only for the limited purpose for which it was introduced." *People v. Littleton,* 2014 IL App (1st) 121950, ¶ 35 (quoting *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24).

¶ 49    To rebut the presumption that the court considered "only competent evidence" in a bench trial, "there must be an affirmative showing in the record that the trial judge actually used the

evidence improperly as alleged. [Citations.]" *Koch*, 248 Ill. App. 3d at 592; *Schmitt*, 131 Ill. 2d at 138-39 ("We must presume the trial court considered only competent evidence unless the contrary affirmatively appears of record or the trial court, confronted with serious improprieties in a case where a defendant's guilt is not manifest, fails to comment on the irregularities or even indicate an awareness thereof.").

¶ 50    The record shows that the trial court *sua sponte* reversed its earlier ruling granting the motion in *limine*, found that the other crimes evidence related to T.P. was improper, and explicitly stated that it would disregard such evidence in deciding the case. Thus, a presumption exists that the trial court did not improperly rely on other crimes evidence in finding Cherry guilty, and Cherry must make an affirmative showing in the record to rebut that presumption. Cherry asserts that the presumption was rebutted because, in the course of finding him guilty, the court referenced testimony elicited from Cherry when he was cross-examined about his encounter with T.P. Specifically, the court noted that Cherry "said he prefers his wom[e]n to be sluts and he doesn't like a woman who's not a slut. That's exactly the kind of individual with that kind of attitude that would rape his own cousin."

¶ 51    After reviewing this comment in the context of the court's other findings, we cannot say that it amounts to an "affirmative showing" that the trial court actually relied on evidence of any crimes against T.P. in finding that Cherry assaulted K.B. Rather, the trial court's ruling makes clear that it relied on the competent evidence of K.B.'s sexual assault in finding Cherry guilty. The transcript of the court's ruling makes plain that, by the time the court commented about Cherry's "sluts" remark, it had thoroughly explained why it found that other evidence proved his guilt. The court first explained that it found K.B. testified "not just credibly but highly

credibl[y]," citing her detailed testimony about how Cherry forced himself on her. The court also noted that K.B.'s description of the sexual assault was corroborated by medical evidence. The court additionally found that K.B.'s testimony was corroborated by T.R., who testified "highly credibly." The court explained that T.R.'s testimony was particularly convincing since she "would have more bias to be on the side of the defendant because she's his first cousin" whereas she had just met K.B. at the time of the incident. After crediting that evidence, the court proceeded to explain that it found that each of Edwards, Moss, and Cherry lacked credibility. It also noted that a stipulation reflected Edwards' prior statements to ASAs, in which he corroborated K.B.'s account of the assault. At no point in its findings did the court make any mention of T.P.'s testimony.

¶ 52    Although the court referenced Cherry's testimony about "sluts," which he gave in response to a question about his interaction with T.P., this reference does not show that the court *relied* on any evidence of a crime against T.P. to find him guilty of assaulting K.B. At most, it appears the court made the comment to criticize Cherry's overall attitude towards women, having already concluded, based on the competent evidence, that he had sexually assaulted K.B. For these reasons, we reject Cherry's contention that the court's comment rebuts the presumption that the court relied on competent evidence.

¶ 53    We further agree with the State that, even assuming *arguendo* that the court erroneously relied on other crimes evidence concerning T.P., this would not be reversible error, given the overwhelming evidence of Cherry's guilt with respect to K.B. That is, we perceive no chance that the verdict would have been different, even if the other crimes evidence had not been admitted in the first place.

¶ 54    Although this was a bench trial, we are guided by the harmless error inquiry applied where other crimes evidence has been improperly admitted in a jury trial. Our supreme court has instructed: "Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. If it is unlikely that the error influenced the jury, reversal is not warranted. [Citation.]" *People v. Hall*, 194 Ill. 2d 305, 339 (2000); *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) ("the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. [Citations.]"). Error in the admission of other crimes evidence is harmless where "the record indicates that the evidence of defendant's guilt, even with the other crimes evidence, was overwhelming." *People v. Martin*, 2012 IL App (1st) 093506, ¶¶ 43-44; see also *People v. Johnson*, 406 Ill. App. 3d 805, 819 (2010) (error in admitting testimony regarding another sexual assault was harmless where "Given the strength of the evidence presented against defendant, mixed with the fact that the State did not put undue emphasis on the other-crimes evidence * * * we cannot say the outcome of his trial would have been different" had other-crimes evidence been excluded).

¶ 55    As described by the trial court, K.B. gave a detailed account of the assault that the court found highly credible. Her testimony was corroborated by medical evidence, as well as T.R.'s recollection of events. In contrast, the testimony of the defense witnesses was inconsistent and impeached, including Edwards' prior statements to ASAs. Given the strength of the State's evidence, we cannot say that the outcome of Cherry's trial would have been different had the

other crimes evidence been excluded. Accordingly, even assuming that the trial court improperly considered evidence related to T.P., that would not result in reversible error.

¶ 56    Affirmed.