**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180139-U

Order filed August 27, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0139 Circuit No. 16-CF-2493 |
| DEXTER W. HARRIS, | ) ) ) | Honorable Carla Alessio-Policandriotes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justices Carter and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  Any error resulting from the admission of the challenged other-crimes evidence was harmless.

¶ 2    Defendant, Dexter W. Harris, appeals his convictions for two counts of home invasion, armed robbery, and aggravated criminal sexual abuse.  Defendant argues that the Will County circuit court erred in allowing the State to present certain other-crimes evidence.  We affirm.

¶ 3                                     I. BACKGROUND

¶ 4 Defendant was charged with three counts of home invasion (720 ILCS 5/19-6(a)(1), (a)(3), (a)(6), (c) (West 2016)), two counts of armed robbery (*id.* § 18-2(a)(1), (a)(2), (b)), one count of aggravated criminal sexual abuse (*id.* § 11-1.60(a)(1), (a)(6), (g)), and one count of unlawful use of a weapon by a felon (*id.* § 24-1.1(a), (e)). Several additional charges were filed but were dismissed prior to trial. All of the charges related to an incident involving a single victim, Tiffany Brown. The incident occurred on October 9, 2016.

¶ 5 Defendant filed a motion *in limine* requesting that the court prohibit the State from, among other things, mentioning that defendant was apprehended in an unrelated case when he was questioned regarding the instant case.

¶ 6 The State filed a motion to admit evidence of other crimes to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or *modus operandi*. The motion alleged that the State would present evidence to show that at approximately 4:24 a.m. on October 9, 2016, defendant, while armed with a weapon, entered Brown's apartment, asked her about someone named Johnny, asked her about money, tied her hands and ankles with shoelaces, covered her face, stole her debit card, stole electronics, stole her vehicle, and fondled her breasts and buttocks.

¶ 7 The motion also alleged between September 25 and November 28, 2016, there were three other reported home invasion cases in the same town where the instant offense occurred and two home invasion cases in nearby towns. The victims in these cases were Norma Sherman, Francine Marena, Ashley Johnson, Margaret Williams, and Tyrobia Villareal. All of the victims except Williams reported that the intruder asked them about someone named Johnny or Joe and asked for money. All of the victims reported that their hands and feet had been bound, and most of the victims reported that they were bound with shoelaces. All of the victims except Johnson reported

2

that their vehicles were stolen. All of the victims reported that their intruders stole or demanded money. Marena, Johnson, and Villareal reported that their intruders stole or attempted to steal electronics. Marena, Johnson, and Villareal also reported that their heads were covered by the intruder. Johnson was able to identify defendant based on his voice. Williams identified defendant in a physical lineup, and she identified a shirt found in defendant's residence as the one he wore when he entered her home. The other victims were unable to identify their intruders.

¶ 8     A hearing was held on the State's motion to admit other crimes evidence and defendant's motion *in limine*. Defendant argued that all of the other-crimes evidence was inadmissible on the basis that it was more prejudicial than probative. Alternatively, defendant argued that the other-crimes evidence should be limited to the two cases where the victims identified defendant. The State discussed the similarities between the offenses and argued that the other-crimes evidence was admissible to show *modus operandi*. Regarding defendant's motion *in limine*, the State indicated that it planned to introduce evidence that defendant was questioned concerning the instant case after he was apprehended for unscrewing lightbulbs from several residences.

¶ 9     The court granted the State's motion to admit proof of other crimes. The court noted that the State sought to use the other-crimes evidence to show *modus operandi*, opportunity, plan, identity, or intent. Regarding defendant's motion *in limine*, the court ruled that the State would not be precluded from presenting evidence that defendant had been apprehended for unscrewing lightbulbs from several residences when he was questioned regarding the instant case.

¶ 10     Prior to the trial, the parties agreed that a limiting instruction would be read to the jury before the testimony of each witness who would testify concerning the other-crimes evidence. The instruction stated that evidence may be presented that defendant was involved in conduct that was not charged in the indictment and that this evidence could be considered only for the limited

purpose of "issues of the defendant's proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or *modus operandi*."

¶ 11    At trial, Brown testified that on October 9, 2016, she attended a wedding with her five-year-old daughter. Brown and her daughter went home after the wedding. Brown's boyfriend was attending a funeral that night, so she unlocked the patio door for him. Brown and her daughter then went to bed. At approximately 4 a.m., Brown woke up and saw a man in her bedroom doorway. He was wearing a black hoodie and a mask. He asked who else was in the apartment, and Brown said it was just her and her daughter. The man pulled her out of bed and walked her into the kitchen. Brown felt a gun being held to her head, but she did not see the gun.

¶ 12    The man put Brown's head in the sink and pressed the gun against her head. The man said that someone named Johnny said there was money in the apartment. The man said he would kill Brown's daughter if she did not tell him where the money was. He asked for her debit card, and she retrieved it. The man then told Brown to take off all of her clothing. He touched her breasts and buttocks and said that it felt good. He then started fidgeting with his belt. The man then "turned around like somebody called him back." He then started talking to someone named Demo about the debit card. Brown did not hear a second voice.

¶ 13    The man told Brown to get on the floor, and he tied her hands and feet with shoelaces. He threw a shirt or a towel over her face. He asked Brown for her PIN, and he said he would come back and kill her and her daughter if she did not give him the correct PIN. The man then left. Brown was able to loosen the ties on her hands and cut her feet loose. She grabbed clothing for her and her daughter and went to her neighbor's apartment across the hall. She saw that her television, computer, and keys were missing. She later saw that her daughter's book bag, her soundbar, her Xbox and another television were missing. She saw that her car was parked where

4

she normally parked it, but it was not parked the same way she had parked it. Her debit card was used twice that morning, and $400 was taken each time. She had told the man that all she had was $800.

¶ 14    Brown never saw the man's face and she could not identify him. She identified photographs of one of the televisions that had been stolen. Brown testified that she had kept the box that her Xbox came in, and it contained the serial number. She identified a photograph of the serial number of her Xbox on the box that it had come in. She also identified an actual Xbox as the one that had been stolen from her apartment. She examined the serial number on the Xbox, and said it matched the one that had been stolen. Brown also identified a soundbar as the one that had been stolen from her apartment. Detective Justin Rimovsky later testified that the Xbox and soundbar that Brown had identified were found in the apartment where defendant resided.

¶ 15    Edward Sullivan testified that on the evening of November 28, 2016, he saw that his exterior lights were out, and his garbage cans were out of place. Sullivan called 911.

¶ 16    Officer Evelyn Pisczor testified that she responded to Sullivan's call. She learned that Sullivan's lightbulbs had been unscrewed far enough that they would not illuminate. Officers observed that six to eight houses in the area had lightbulbs that had been unscrewed or were missing. Pisczor observed a black male standing outside in that area. That individual was eventually apprehended, and officers found a screwdriver on his person. She identified defendant in court as the individual that she apprehended.

¶ 17    Detective Rimovsky testified that he investigated a series of home invasions starting in September 2016. Rimovsky interviewed defendant after his arrest on November 28, 2016. Rimovsky determined that defendant lived in the same apartment complex as Brown. Rimovsky went to defendant's residence and spoke with Jasmine Harris, defendant's sister, who also resided

at the apartment. Rimovsky observed a black long-sleeve shirt that had "cuts" down the arm, a zipper that went across the chest horizontally, and white writing at the bottom. The shirt matched the description of a shirt that was worn during the home invasion involving Williams. Rimovsky identified the shirt in court. Rimovsky observed items in plain view that were similar to items taken in other home invasions, including a soundbar, a television, and an Xbox. Rimovsky obtained a search warrant for the apartment and collected these items. He identified the Xbox and soundbar that had been found in the apartment. The serial number on the Xbox matched the serial number of Brown's Xbox. The soundbar and television that were found in the apartment were the ones that Brown reported missing. In the apartment, officers located a ComEd bill with defendant's name on it and prescription bottles labeled with defendant's name.

¶ 18    Several of the victims of the other home invasions testified. Before the testimony of each of these witnesses, the court read the limiting instruction the parties had previously agreed upon.

¶ 19    Sherman testified that on September 25, 2016, she was in her home watching television when she saw that a man was there. The man tried to cover his face, and he put something over Sherman's head. He had her lie on the floor, and he tied her hands behind her back with shoelaces. He said that "Joey or Johnny" had told him that Sherman had $20,000. Sherman said there was $60 in her chair cushion, and the man took the money. He put something on the back of Sherman's head. Sherman stated: "I guess he thought I would think it was his gun, you know." Sherman broke free, ran to a neighbor's house, and called the police. Sherman later realized her car was missing. Sherman never saw the man's face or made an identification.

¶ 20    Johnson testified that on election day in 2016, she returned home at 6:30 or 7 p.m. At approximately 8:30 p.m., Johnson heard something in the hallway. She turned and saw a man wearing a ski mask. He put his hands over her mouth and held a knife to her thigh. The man asked

6

where Joe was and said that Joe owed him $3000. The prosecutor asked if the man said Joe or Johnny. Johnson then said that he said Johnny, not Joe. The man asked Johnson for money and her debit card. He tied Johnson's hands and feet with shoelaces, walked her to another room, told her to get on the floor, and put a scarf over her head. The man allowed Johnson to use the bathroom, and he made a derogatory comment about the smell. The man never removed his mask. Johnson's mother returned home, and the man tried to attack her. Johnson ran out the back door and called the police from a neighbor's house.

¶ 21    Johnson identified defendant in court as the man who had been in her residence. Johnson testified that she identified defendant by his voice approximately two weeks after the incident. The police gave her a lineup of individuals and had them all repeat the same derogatory phrase the man had said to her. She could see and hear the individuals during the lineup.

¶ 22    Denise Ellis, Johnson's mother, testified that she arrived home at 12:30 a.m. the morning after election day. Her front porch light was out, her television was missing, and her living room looked disheveled. A person wearing a mask grabbed her, and they began to fight on the front porch. He showed her that he had a knife. Ellis became injured during the altercation and was bleeding from her head. The man asked for her purse, took her debit card, and ran away.

¶ 23    Williams testified that at approximately 10:30 p.m. on November 12, 2016, she woke up and saw a strange man in her bedroom. About half of his face was covered. The man took her into another bedroom, tied her hands and feet with a cord, and threatened her with a knife. The man asked for money, obtained Williams's debit card from her purse, and asked for her PIN. Williams eventually broke free and called the police. Williams's car was taken during the incident, and it was found on the next block. The man withdrew approximately $1000 from Williams's bank account. Williams identified defendant in court as the person who entered her home. The

7

prosecutor showed Williams the black shirt that Rimovsky found in defendant's residence. Williams identified it as the one that defendant was wearing on the night of the incident. Williams did not remember telling an officer that the intruder was white.

¶ 24 Villareal testified that on November 15, 2016, she arrived home at approximately 7 p.m. A man was in her house. He grabbed her and tied her up with shoelaces. The man said that Villareal knew "some guy," but she could not remember the name of the individual that the man claimed she knew. The man asked where this "guy" was and when he was coming back. The man threw a rug over her head and rummaged throughout the house. The man asked for money and removed several cards from her purse. He asked Villareal to select her debit card, but she never did. He also asked for her PIN. He tried to go outside and unlock her car. He came back inside and saw that Villareal had gotten loose from the ties. He tied her up again and hit her in the head several times. The man went back outside. Villareal freed her hands, locked herself in the bathroom, and called the police. When she exited the bathroom, she saw that her PlayStation and several televisions were sitting by the front door.

¶ 25 The State rested.

¶ 26 Defendant presented a stipulation that, if called to testify, Officer Haythan Elyyan would testify that Williams told Elyyan that the man who entered her home was a white male.

¶ 27 Defendant testified that he purchased the electronics found in Jasmine's apartment from two white men who were exiting his apartment building. Defendant stated that he did not live in the apartment; he was just visiting Jasmine. He purchased the black sweatshirt from a store called Forman Mills. There were more sweatshirts of that same style in different sizes on the rack. Defendant testified that he did not unscrew any lightbulbs on the night of his arrest and that the

8

officers planted the screwdriver on him. Defendant acknowledged that he had prior felony convictions for robbery and aggravated possession of a stolen vehicle.

¶ 28    The jury found defendant guilty of aggravated criminal sexual abuse, two counts of home invasion, and one count of armed robbery. The jury found defendant not guilty of one count of home invasion, one count of armed robbery, and unlawful use of a weapon by a felon. The court sentenced defendant to concurrent sentences of 23 years' imprisonment for armed robbery and the two counts of home invasion. The court sentenced defendant to 17 years' imprisonment for aggravated criminal sexual abuse, to run consecutively with the other sentences.

¶ 29                                    II. ANALYSIS

¶ 30    Defendant argues that the circuit court erred in allowing Sherman and Villareal to testify at his trial because they were unable to identify their intruders.[1] Defendant contends this testimony was improperly admitted because there was nothing more than mere suspicion to connect him to these crimes. Defendant also argues that the court erred in admitting Sherman's and Villareal's testimony to establish motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or *modus operandi*. Defendant alternatively argues that, even if the evidence was admissible, its probative value was substantially outweighed by its prejudicial effect on his right to a fair trial. Defendant also argues that the court erred in allowing Sullivan and Pisczor to testify regarding defendant's arrest for unscrewing lightbulbs. We find that any error in the admission of this other-crimes evidence was harmless.

¶ 31    "[E]vidence of other crimes committed by the defendant is admissible if it is relevant for any purpose other than to show the propensity to commit a crime." *People v. Thingvold*, 145 Ill.

---

[1]Defendant also argues that the court erred in ruling that Marena would be allowed to testify. However, she did not actually testify at the trial.

2d 441, 455 (1991). "Other-crimes evidence is admissible to show *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime with which the defendant is charged." *People v. Pikes*, 2013 IL 115171, ¶ 11; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, before other-crimes evidence is admitted, "the State must first show that a crime took place and that *the defendant committed it or participated in its commission*." (Emphasis in original.) *Thingvold*, 145 Ill. 2d at 455. The State is not required to prove beyond a reasonable doubt that the defendant committed the other crime, but there must be proof beyond a mere suspicion. *Id.* Relevant other-crimes evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 32        A court's ruling on the admissibility of other-crimes evidence is typically reviewed for an abuse of discretion. See *Pikes*, 2013 IL 115171, ¶ 12; *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). However, defendant contends that the appropriate standard of review in this case is *de novo* because the court admitted the other-crimes evidence based on an erroneous application of the law. Even if we accept defendant's argument that a *de novo* standard applies and assume that the court erred in admitting the testimony of Sherman, Villareal, Sullivan, and Pisczor, we find that any error in the admission of this evidence was harmless.

¶ 33        "[T]he improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). "An error in admitting other-crimes evidence is harmless if there is substantial evidence of the defendant's guilt." *People v. Sims*, 2019 IL App (3d) 170417, ¶ 30.

¶ 34        Here, the properly admitted evidence of defendant's guilt was substantial. Brown testified that a man entered her apartment, threatened her, asked her about Johnny and money, forced her to undress, touched her sexually, tied her hands and feet with shoelaces, put a towel or shirt over

10

her head, and stole her debit card and electronics. Brown's stolen electronics were later found in the same apartment where defendant resided. Also, Johnson and Williams testified that they were the victims of similar home invasions and that defendant was the perpetrator. Johnson was able to identify defendant by his voice after the incident. Williams was able to identify defendant in court as the individual who committed the offense. Williams also identified a black shirt that defendant wore during the incident, which was later found in defendant's residence. Given the extensive evidence of defendant's guilt, the admission of Sherman's and Villareal's testimony that they were the victims of similar home invasions but could not identify their intruders did not prejudice defendant or deny him a fair trial.

¶ 35        Defendant also argues that the court erred in admitting Sullivan's and Pisczor's testimony concerning defendant's arrest after he allegedly unscrewed exterior lightbulbs from several houses. Defendant contends that this evidence was irrelevant to the charged offense and prejudicial to defendant. Even if we accept defendant's argument that this evidence was erroneously admitted, it was harmless beyond a reasonable doubt. As we have discussed, there was substantial evidence that defendant committed the charged offense. *Supra* ¶ 34. Also, given the serious nature of the instant offense and the properly admitted other-crimes evidence of the home invasions involving Johnson and Williams, evidence that defendant may have tampered with the exterior lightbulbs on several residences was unlikely to prejudice the jury.

¶ 36                                III. CONCLUSION

¶ 37        The judgment of the circuit court of Will County is affirmed.

¶ 38        Affirmed.

11