2025 IL App (1st) 240473-U

SIXTH DIVISION

September 12, 2025

No. 1-24-0473

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22CR06554-01 |
| ROBERT LEWIS, | ) ) | Honorable |
| Defendant-Appellant. | ) ) | James Bryan Novy, Judge, presiding. |

_____

PRSIDING JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Pucinski and Gamrath concurred in the judgment.

**ORDER**

¶ 1  *Held:*  We affirm where (1) defendant forfeited any Rule 401(a) claim when he failed to raise that issue in his *pro se* motion for a new trial and (2) the admission of other crimes evidence was harmless error. The circuit court erred by failing to conduct a *Krankel* inquiry, and we remand with instruction for the circuit court to conduct an adequate *Krankel* hearing into defendant's claims of ineffective assistance of counsel. Defendant's mittimus shall be corrected to reflect the circuit court's ruling.

¶ 2    Following a jury trial, defendant Robert Lewis was found guilty of attempted murder (720 ILCS 5/8-4(a) (West 2024)) and sentenced to 40 years in the Illinois Department of Corrections. On appeal, Lewis argues that (1) the circuit court failed to admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before allowing him to proceed *pro se*; (2) the court erred by allowing the State to admit proof of other-crimes; (3) he was denied his right to effective representation when counsel failed to object when the State introduced other-crimes evidence beyond what the court deemed admissible, and (4) the circuit court failed to conduct an adequate *Krankel* hearing, and it's ruling that all his claims of ineffective assistance of counsel involved matters of trial strategy was error. For the following reasons, we affirm in part, and remand the cause with directions for the circuit court to make a proper factual inquiry into defendant's claims of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill.2d 181 (1984).

¶ 3                                    I. BACKGROUND

¶ 4    On June 9, 2022, the State filed a 10 count indictment against Lewis, including charges of attempted murder and aggravated battery with a firearm against his ex-wife, Lauren Carrion. Defense counsel represented Lewis in pretrial proceedings and the jury trial. Lewis filed several *pro se* motions and affidavits seeking dismissal of the charges, which were later withdrawn by counsel. The court reminded him that it would not consider *pro se* filings while he was represented by counsel and the attempted murder charge carried a potential prison term of 31 to 55 years. It asked Lewis if he wished to represent himself, but he chose to continue with counsel.

¶ 5    The State moved to admit proof of other-crimes evidence on December 21, 2022, and on January 11, 2023, the court heard arguments from the State on that motion. The State proffered that Lewis and Carrion were married between 2006 and 2013 and had two children together, a son and a daughter. On March 29, 2022, Carrion was staying at her mother's house and left around

10:30 p.m. to go to a friend's house. She noticed a dark colored vehicle sitting in an alley near the house with its headlights on. As she drove away, that same vehicle followed her. Carrion became scared and suspicious, made a U-turn and drove toward the First District police station. The vehicle followed her until she came to a red light. It pulled alongside her on the passenger side, and she heard the driver say, "where are you going?" She recognized the voice as her ex-husband's and immediately grabbed her phone and called 911. Moments later, Carrion heard gunshots and drove towards the police station, where she waved down officers and explained what happened. She immediately identified the shooter as her ex-husband. Carrion sustained two gunshot wounds, one to the thigh and one to the abdomen. Her car was processed and there were several bullet holes photographed on the passenger side of the vehicle.

¶ 6    The State sought to introduce evidence of several prior incidents involving Carrion and Lewis during their marriage and after their divorce. The first three incidents occurred while they were married. In the first, Lewis allegedly pushed Carrion to the ground, causing injuries that required stitches. She did not report this to police. In the second, he allegedly followed her to work and struck her with a firearm. The third incident involved an alleged attempt to choke her.

¶ 7    On March 5, 2013, while Lewis and Carrion were still married, he allegedly appeared at her workplace and struck her several times in the body with a closed fist during an argument. The next incident occurred that same evening. Lewis allegedly pulled her into a bedroom, punched her, and struck her with a wooden board from the bed frame several times. Carrion did not report this to police at first but six days later, on March 11, 2013, her mother called police for a wellbeing check. Officers arrived on scene, and she told them what happened on March 5, 2013. She showed officers her bruises but declined to press charges against Lewis. The incident was documented by the Chicago Police Department (CPD).

¶ 8    On March 5, 2015, Carrion met Lewis outside of her house because he was dropping off their children. Carrion had her cell phone in her hand and Lewis grabbed it and took it, not returning the phone until March 12, 2015. This incident was documented by the CPD.

¶ 9    On September 28, 2021, Lewis allegedly "attacked" their son over receiving bad grades, and when Carrion's mother tried to intervene, pushed her to the ground. The incident was captured on surveillance footage and documented by the CPD. Two days after Lewis allegedly attacked their son, Carrion went to the courthouse to obtain an order of protection against Lewis. While at the courthouse, Carrion received a call from a neighbor that there was a fire at Carrion's house. Carrion was forced to leave the courthouse before obtaining the order of protection. Ultimately Lewis was charged with residential arson after an investigation into the fire.

¶ 10   That same day, someone discharged a firearm into the residence of Carrion's father in Matteson, Illinois. Approximately six bullet holes were discovered. Witnesses observed a dark colored SUV leaving the area at a high rate of speed after shots were fired. Matteson officers ran a search on their license plate readers for two license plates on cars Lewis was known to drive. Less than 9 minutes after the shooting, one of the vehicles registered to his current wife was seen heading eastbound, just under a mile and a half from the scene.

¶ 11   Around 10 days after her father's residence was shot at, on October 9, 2021, Carrion reported to the CPD that she received threatening texts and calls from an unknown number. On February 21, 2022, she received a phone call from Lewis. During the call, the two got into an argument and he threatened to kill her and her grandmother. This incident was also reported to CPD.

¶ 12   The circuit court noted that, ". . . I have a major problem with proof of other crimes, even if we are talking about the same relationship between the same people when the best foundation you

can give me is a seven year period" and "I will take another look at it, but right now the seven year range, I find that to be unfair to this person. I am not going to allow you to present it to the trier of fact, unless you can come to me with a lot more. It's got to be a much more narrow time frame." The court declined to admit the alleged incident involving Lewis taking Carrion's phone for two days, but allowed both March 5, 2013, allegations finding them more probative than prejudicial on issues of identity and intent. It withheld talking about propensity at that time. The court also found the incident involving Lewis and his son's altercation over bad grades to be irrelevant and inadmissible. Additionally, it took the residential arson incident under advisement and declined to admit the shots fired at Carrion's father's residence into evidence.

¶ 13 The circuit court declined to admit the threatening text messages, citing the lack of nexus and the unreliability of the evidence. However, it admitted the phone call between Carrion and Lewis, where he allegedly threatened to kill her and her grandmother, finding the call relevant on intent and more probative than prejudicial. The court continued the proof of other-crimes motion by agreement to January 31, 2023. On that day, the court heard additional information from the State regarding the incident where Lewis allegedly pushed Carrion in the bathroom, causing injuries that required stitches. Based on medical records, Carrion was able to pinpoint the incident to August 18, or 19, 2007. The court found this sufficiently reliable for admission into evidence. But it found the alleged residential arson inadmissible because she could not identify Lewis from the footage.

¶ 14 Finally, upon reconsideration, the court held the jury had "the right to know that she got an order of protection before she claims that he tried to shoot and kill her." It further held that the State could tell the jury why she got the order of protection but would instruct the jury that the

allegation with the son was not proof of other-crimes, but a basis for the order of protection "because she wanted to protect her son as well as herself."

¶ 15    On February 27, 2023, the State supplemented its motion with more proof of other-crimes evidence. The State alleged that between January 17, 2022, and January 23, 2022, Lewis called Carrion and "threatened her to drop the case." Defense counsel filed its response in opposition, arguing the allegation was unreliable and prejudiced Lewis. The circuit court allowed the evidence, finding it was not proof of other crimes and noted defense counsel had notice of the matter from tendered discovery.

¶ 16    The circuit court asked Lewis whether he wanted counsel to be his lawyer after he filed a *pro se* motion for dismissal based on speedy trial violations. Lewis replied that he wanted to keep his counsel but would like the speedy trial matter to be addressed. Defense counsel noted some *pro se* motions and affidavits demanding trial but had not filed a demand on behalf of Lewis. The court ruled there would be no dismissal based on speedy trial violations.

¶ 17    The jury trial began on February 28, 2023. At trial, Carrion testified that she met Lewis in high school and married him in February of 2006. She had a son and daughter with Lewis. In 2013, they divorced because Lewis became "aggressive and controlling. Things of that nature." She stated that on August 18, 2007, she and Lewis were living at her mother's when the two got into an argument in the bathroom. Lewis pushed her into the shower, and she fell on the metal railing of the door frame. Carrion required medical attention and stitches at Northwestern Hospital. She stated that she lied to medical staff about how she was injured because she was "too scared to say anything," and Lewis was the reason why.

¶ 18    On March 5, 2013, Carrion intended to receive a ride to work from a male co-worker. Lewis was "really mad" when he found out and insisted that he would drive Carrion to work. While

driving to Carrion's job, Lewis and she engaged in an argument. Once they arrived at Carrion's workplace, he started yelling and hitting her in the head with his hands. Lewis then pulled a gun out and started hitting her in the head with it. She was bruised after the incident but prevented her coworkers from seeing injuries by wearing a hat. Carrion did not tell anyone at work or call the police. Later that evening, Lewis was punching her "everywhere" and during the beating, he "grabbed a piece of the wood from the slab underneath the bed and used that to hit me as well. Then he eventually got a gun and started hitting me with the gun as well." She did not call the police or leave the apartment.

¶ 19    Nearly a week later, Carrion went to her mother's house and told her mother about the incident with Lewis a week prior. Subsequently, her mother called the police to do a well being check and Carrion told police what happened but declined to press charges. On September 28, 2021, Lewis showed up to Carrion's house unannounced. He was upset with their son and daughter because of their grades and had to "put both of them on punishment." She stated, "I was with my daughter, and my mother was at the house at the time as well. She [her mother] said that something didn't feel right, I am going to go down there with him, so she went down there. . . it took a while for anybody to come back upstairs, and then I also eventually like heard sirens and whatnot, and in passing with my mom, I found out that he beat my son up as well as harmed my mother." Her son had bruising on his face, swollen cheeks and lips, cuts and scratches, was holding his hand like it was broken, and his ribs and torso area were hurting. Lewis drove off before the police arrived.

¶ 20    Two days later Carrion went to the courthouse to obtain an order of protection for herself and her children because "one of them got harmed a few days prior and then the other one was taken." She had to extend the order of protection every two weeks because Lewis could not be served.  After the incident with her son, Carrion stated that she stopped communicating with Lewis.

¶ 21   On January 15, 2022, Lewis called her from an unknown number. During the call he threatened her because he wanted her to drop the case. On February 21, 2022, she received another phone call from Lewis where he stated, "Drop the case or else street justice and I will kill you and your grandmother."

¶ 22   On March 20, 2022, she extended the order of protection against Lewis through a hearing over Zoom. Later that evening around 10:30 p.m. she exited her building and observed a black vehicle with its headlights on parked in the alley. She thought this was suspicious based on the time of night and the vehicle "just sitting there." After leaving, the same vehicle followed her. She took evasive action to see if it would follow her and it did. She made a U-turn towards the police station when she came to 18th Street and Michigan Avenue and stopped at a red light.

¶ 23   The vehicle approached the passenger side of her car. She heard yelling and knew from the voice that it was Lewis. He wore a beanie hat and track suit jacket. Carrion acknowledged that her car as well as the black vehicle had tinted windows, but she could still see inside of the vehicle, which was about seven to eight feet away. As she was calling 911, she heard gunshots and immediately drove to the police station. Upon arrival, she encountered two Chicago police officers in the parking lot. The officers shined their flashlight on Carrion and saw she had been shot in her upper right thigh and in her abdomen area. At the hospital she told Detective Jessica Sosa that Lewis was the person who shot her. She also stated she knew Lewis drove a black BMW which was either a sedan or SUV.

¶ 24   David Madia, a Chicago police sergeant, testified that he saw Carrion at the police station after she encountered two police officers in the parking lot. Carrion provided the name of her ex-husband.

¶ 25 Keith LeFlore, a Chicago police officer, testified he was the evidence technician in the case. He observed suspected bullet holes in Carrion's vehicle on the passenger side front door. In the front driver seat, he recovered a metal fragment and found a fired bullet between the front driver's seat and the lower door seal.

¶ 26 Edward Brooks, a Chicago police officer assigned to the Chicago Police Fugitive Apprehension Task Force testified that on May 13, 2022, he along with officers from the Great Lakes Fugitive Task Force, U.S. Marshals, Illinois Department of Corrections, and CPD responded to a residence on the 1600 block of West Maple Lane in Crete, Illinois because they had a warrant for his arrest. Lewis came out of the residence without incident.

¶ 27 Jessica Sosa, a Chicago police detective, testified that she and her partner, Detective Adrian Corral, were the lead investigators in the case. Officer Sosa responded to the First District police station after stopping at the crime scene. She observed three bullet holes on the passenger side of Carrion's vehicle. Officer Sosa went to Northwestern Hospital to speak with Carrion. Carrion told Officer Sosa it was her ex-husband who shot her. Carrion obtained a warrant on April 1, 2022, and Lewis was located and arrested on May 13, 2022.

¶ 28 On cross examination, Officer Sosa denied she learned where Lewis lived because of Carrion's information. She stated she only knew the name and date of birth of Lewis, and that she and Carrion discussed several places where he might be, as Carrion was still trying to find her daughter, who was with Lewis despite his lack of custody. Officer Sosa never searched for a firearm because the car Lewis was driving was not recovered, but she expected to see gunshot residue in that car because the allegation was that his car windows were up.

¶ 29 The State rested its case in chief, and the court denied a motion from Lewis for a directed finding. The only evidence Lewis presented was a stipulation that Officer Vickie Adams wrote a

report on March 11, 2013, regarding an incident that occurred on March 5, 2013. In that report, Officer Adams did not include information that Carrion told her that Lewis struck Carrion with a firearm. Following this stipulation, Lewis rested. The jury returned a verdict of guilty on both counts of attempted murder and aggravated battery with a firearm.

¶ 30    On March 30, 2023, Lewis filed a *pro se* posttrial motion, claiming in relevant part he deserved a new trial because counsel was ineffective, there was insufficient evidence to support his conviction, State and court errors, prosecutorial misconduct, police misconduct, due process violations, and speedy trial violations.

¶ 31    On April 4, 2023, the circuit court granted defense counsel leave to withdraw and informed Lewis that it could not allow him to proceed *pro se* or address his *pro se* motions because the judge presiding over his residential arson case had ordered a behavior clinical examination ("BCX"). Lewis stated to the court "right now I'm going to go *pro se*." The court replied, "You're not pro se yet. . . you're telling me you want a continuance to hire a lawyer. That's what I'm going to do." Lewis stated he was considering hiring a lawyer, and the court continued the matter for new private counsel and a return of the BCX.

¶ 32    During the hearing on May 3, 2023, the court inquired who Lewis had in mind to represent him. Lewis replied, "Actually I've decided to proceed *pro se*." The court stated that there is a "lengthy conversation" needed before allowing Lewis to proceed *pro se*. It also acknowledged his *pro se* motion was sufficient to trigger a *Krankel* hearing "right now." On June 6, during a hearing, Judge Linn acknowledged Lewis was self-represented. On August 14, 2023, the court informed Lewis it did not have "concerns about fitness" and felt it was "in the interest of justice" to not wait until the BCX had been completed. The BCX was delayed for nearly nine months and was not completed in the statutory allotted time. Lewis notified the court that he filed a habeas corpus

petition in the supreme court. The court asked Lewis, "Do you still want to represent yourself, Robert? I already told you what you're looking at possibly." Lewis replied, "That's correct." The court explained that it could not do anything substantive while the habeas corpus petition was pending.

¶ 33   Subsequently the Honorable James Linn retired on August 21, 2023, and the case was transferred to the Honorable James Novy. The matter was before the court on October 16, 2023, and Lewis withdrew his supreme court petition for habeas corpus and asked the court to hear the petition.

¶ 34   On January 9, 2024, the court held Lewis had "filed numerous motions" since his conviction. It held it had "read and considered" the motions and found them to be without merit. Additionally, "that posttrial motions are governed by 725 ILCS Section 5 Article 116 and the sections thereof. Additional filings that do not meet the requirements of Article 116 are summarily denied."  The court admonished Lewis that he was "entitled to file motions under 725 ILCS 5/116" and it would only consider those motions. The court denied a motion for a new trial and held there was no basis for ineffective assistance of counsel, finding the complaints from Lewis fell under trial strategy. Lewis protested about the dismissal of his *habeas corpus* petition and the court admonished him that his motions, aside from those filed under Section 5/116, were "without merit."

¶ 35   On January 19, 2024, the circuit court merged the aggravated battery with a firearm charge into the attempted murder charge and sentenced Lewis to 40 years in the Illinois Department of Corrections. Lewis was appointed counsel to represent him on direct appeal and on February 23, 2024, the court denied a motion to reconsider, reduce, or vacate his sentence. This appeal followed.

¶ 36                                          II. JURISDICTION

¶ 37    The circuit court denied the motion to reconsider sentence filed by Lewis on February 23, 2024. Notice of appeal was timely filed on February 23, 2024. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606. (eff. Dec. 7, 2023).

¶ 38                                III. ANALYSIS

¶ 39    On appeal, Lewis argues (1) the circuit court failed to admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before allowing him to proceed *pro se*; (2) the court erred by allowing the State to admit proof of other-crimes; (3) he was denied his right to effective representation when counsel failed to object when the State admitted other crimes evidence beyond the evidence permitted by the court, and (4) the court failed to conduct an adequate *Krankel* hearing, and its ruling that all his claims involved matters of trial strategy was error.

¶ 40            A. Admonishment Pursuant to Illinois Supreme Court Rule 401(a)

¶ 41    Lewis contends the circuit court failed to admonish him pursuant to Rule 401(a) before allowing him to proceed *pro se*.  He asks this court to review this issue under plain error and remand the matter back to the circuit court to allow him to file a motion for a new trial, participate in the presentence investigation, and allow him to present mitigation at his sentencing "unaffected by uncounseled choices he made."

¶ 42    Criminal defendants have the right to counsel and to self-representation. *People v. Marcum*, 2024 IL 128687, ¶ 43. The choice to proceed *pro se* must be made knowingly, intelligently, and voluntarily. *Id*. To substantially comply with Rule 401(a) the trial court must inform defendants in open court of: (1) the nature of the charges; (2) the minimum and maximum sentences faced if convicted including any enhanced penalties; and (3) the right to have counsel appointed for them

if they are indigent. Ill. S. Ct. R. 401(a) eff. July 1, 1984). Whether a court substantially complied with Rule 401(a) is subject to *de novo* review. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 43 The State argues that Lewis did not raise this issue in his *pro se* motions for a new trial, thus the argument is forfeited. It further contends that even if we find the argument is not forfeited, the claim fails because Lewis only requests second prong plain error review, but the Illinois Supreme Court ruled Rule 401(a) claims, if not raised in a post plea or posttrial motion, are not cognizable as second-prong plain error but only as first-prong plain error. *People v. Ratliff*, 2024 IL 129356, ¶ 46.

¶ 44 The State's characterization of Lewis' plain error request is accurate, as he argues only for second-prong review. And *Ratliff* makes clear that such claims can only be pursued under the first prong. In the absence of any argument from Lewis on whether this alleged error constitutes first-prong plain error, the claim fails.

¶ 45 　　　　　　　　　　B. Admission of Proof of Other-Crimes Evidence

¶ 46 Lewis further claims the circuit court erred when it admitted into evidence his prior alleged bad acts. Specifically, he argues the State's use of other-crimes evidence was more prejudicial than probative because the allegations were uncharged, unproven, remote in time, and factually dissimilar to the charged offense. He further contends if the circuit court did not abuse its discretion in admitting the evidence, it nonetheless committed reversible error by allowing the evidence to become the focal point of the trial and by failing to limit it to only those details necessary to serve its admitted purpose.

¶ 47 The State counters the record shows there is no basis in Lewis's argument that the other crimes evidence became the focal point of the jury trial. And, even if the court abused its discretion by admitting the evidence, the evidence of guilt was so overwhelming that any error was harmless.

13

¶ 48    "The trial court has discretion to decide whether to admit evidence of prior misconduct, and this court will not disturb the trial court's determination unless the trial court abused its discretion." *People v. Donoho*, 204 Ill. 2d 159, 182 (2003) ("We will not reverse the trial court's decision to admit other-crimes evidence unless we find that the court abused its discretion.").

¶ 49    In assessing the probative value of the prior offense against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged offense; and (3) other relevant facts and circumstances. 725 ILCS 5/115-7.3(c) (West 2014). Defendant need not be convicted of the earlier offense for other crimes evidence to be admissible. *People v. Null*, 2013 ILL App (2d) 110189, ¶ 47. The State bears the burden of showing harmless error. *People v. Jackson*, 2022 IL 127256, ¶ 23.

¶ 50    We note Lewis admits he will not address admission of the evidence under 725 ILCS 5/115-7.4 (West 2024) because the circuit court did not make a ruling on propensity and the instructions to the jury stated other-crimes evidence was admitted for the limited purpose of intent and identity.

¶ 51    We find even if the circuit court abused its discretion when it admitted other-crimes evidence, Lewis is not entitled to a new trial because the error was harmless. "The improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial because of its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). And "An error in admitting other-crimes evidence is harmless if there is substantial evidence of the defendant's guilt." *Id*. at 530-31. In this case, Carrion identified Lewis as the person who followed her in a car and shot her at a red light; thus, the evidence of his guilt is overwhelming, as her familiarity with her ex-husband cannot legitimately be contested.

¶ 52    Next, Lewis argues that even if the circuit court did not abuse its discretion in admitting the evidence, it nonetheless committed reversible error by allowing that evidence to become the focal

point of the trial and by failing to limit it to only the necessary details required to serve its admitted purpose. A review of the record supports the contention that the circuit court did not allow the evidence to become the focal point of the trial. The court found the evidence more probative than prejudicial and admissible for the purpose of identity and intent. The court excluded specific evidence, demonstrating its efforts to keep the focus narrow and relevant: it found the alleged residential arson inadmissible because Carrion could not identify Lewis from the footage, and declined to admit the threatening text messages due to a lack of nexus and concern about the reliability of the evidence. Further, the court noted its concern regarding the admission of some evidence, specifically the order of protection. It held the jury had "the right to know that she got an order of protection before she claims that he tried to shoot and kill her." Also, that the State could tell the jury why she got the order of protection but would instruct the jury that the allegation with the son was not proof of other-crimes, but a basis for the order of protection. The court's approach weighed the probative value against the prejudicial effect and admitted that evidence with appropriate limiting instructions, and the court did not allow the other-crimes evidence to become a focal point of the trial.

¶ 53    C. Alleged Ineffective Assistance and Failure to Conduct Adequate Krankel Hearing

¶ 54    Next, Lewis contends he was denied his right to effective representation when counsel failed to object to other-crimes evidence that was beyond the evidence permitted by the court. Lewis also argues the circuit court failed to conduct an adequate hearing on his *pro se* posttrial ineffective assistance of counsel claims per the requirements of *People v. Krankel* and its progeny. He asserts the court's ruling that all his claims involved matters of trial strategy was error. Judge Linn stated the allegations in the *pro se* motion for a new trial were sufficient to trigger a *Krankel* hearing, but prior to his retirement Judge Linn did not conduct a *Krankel* hearing. Without conducting a

Krankel inquiry, Judge Novy found the posttrial motions meritless because they involved complaints of trial strategy.

¶ 55    "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's pro se allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78. The issue of whether the circuit court adequately conducted a preliminary *Krankel* inquiry is reviewed *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33.  "A *pro se* posttrial claim alleging ineffective assistance of counsel is governed by the common law procedure developed from *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny." *People v. Ayres*, 2017 IL 120071, ¶ 1. Here, we must determine whether the allegation of ineffective assistance of counsel in his posttrial petition triggered the circuit court's duty to inquire into the factual basis of his claim. *Id*. The appointment of new counsel is not automatically required when a defendant makes a *pro se* claim of ineffective assistance of counsel. *Id*. ¶ 11. The circuit court must conduct an inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 79 (2003). Specifically, the court must conduct an adequate inquiry to determine the factual basis of the claim. *People v. Banks*, 237 Ill. 2d 154, 213 (2010). After an inquiry has been made, "if the trial court determines that claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *People v. Jolly*, 2014 IL 117142, ¶ 29 (quoting *People v. Moore*, 207 Ill. 2d 68, 78 (2003)). It may base its decision on a brief discussion with the defendant, knowledge of counsel's performance at trial, and insufficiencies of defendant's allegation or counsel's explanations. *People v. Smith*, 2016 IL App (1st) 140039, ¶ 14. Here, Judge Novy had no discussion with the defendant, no knowledge of counsel's performance during trial, and no

explanations from counsel. Further, Judge Novy made no inquiries as required by *Krankel*. *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 56    We find the record supports the contention that Lewis made allegations that went beyond trial strategy and the circuit court did not make an adequate inquiry into those allegations to satisfy *Krankel*. On April 4, 2023, Judge Linn correctly stated, "you pretty much filed enough to have a *Krankel* hearing right now in your own *pro se* motion." Lewis alleged his trial counsel was ineffective when he operated under a conflict of interest because counsel had "business relationships with ties to the complaining witness and attorney referral services connection which affected excessive fees charged to the defendant." A review of the record shows claims of ineffective assistance of counsel were never addressed. We remand for the circuit court to make a proper factual inquiry into defendant's claims of ineffective assistance of counsel.

¶ 57                                    IV. CONCLUSION

¶ 58    For the foregoing reasons, we affirm where defendant forfeited his Rule 401(a) claim and the admission of other-crimes evidence, even if erroneous, constituted harmless error. We remand with instruction for the circuit court to conduct an adequate *Krankel* hearing addressing all relevant claims advanced by defendant.

¶ 59    Affirmed in part; remanded in part with instruction.